# Russ, Appellant, *v.* Commonwealth.

*Constitutional law—Legislative authority—Appropriations—Contract to supply meals to members of the legislature while attending dedication of the Grant Monument in New York.*

By a concurrent resolution passed over the governor's veto on April 21, 1897, by the senate and the house of representatives, the two houses resolved to attend in a body the dedication of the monument erected in memory of General Grant at New York, and further resolved "that all matters pertaining to such attendance be referred to the Committee on Military Affairs of the Senate and House." The committees entered into a contract with a caterer to furnish two meals in New York on the day of the dedication. The meals, consisting of edibles, wines and cigars, were furnished in accordance with the agreement. *Held,* (1) that the committee had power under the resolution to make the contract; (2) that the legislature had the power under the constitution to authorize the committee to make the contract in question; and (3) that the contract did not violate article 2, section 8 of the constitution which prohibits members of the legislature from receiving any other compensation than their salary.

*Statutes—Diverse statutes—Construction.*

If divers statutes relate to the same thing, they ought all to be taken into consideration in construing any one of them. It is an established rule of law, that all acts in pari materia are to be taken together as if they were one law.

The concurrent resolution of April 21, 1897, P. L. 556, and the Act of May 15, 1903, P. L. 406, appropriating money to pay for the supplies furnished under the concurrent resolution are to be construed together as indicating the legislative understanding of what was intended by the concurrent resolution.

*Constitutional law—Legislative power—Restrictions on legislature.*

The test of legislative power is constitutional restriction; what the people have not said in the organic law their representatives shall not do, they may do.

There is nothing in the constitution of Pennsylvania to prohibit the legislature from attending a commemorative patriotic celebration in a body, and to provide that the expenses of their meals when attending such celebration shall be paid out of the public funds.

Mestrezat and Potter, JJ., dissent.

Argued May 24, 1904. Reargued October 17, 1904. Appeal, No. 7, May T., 1904, by plaintiff, from order of C. P. Dauphin Co., Commonwealth Docket, 1903, No. 26, refusing to take off nonsuit in case of James Russ v. Commonwealth of Pennsylvania. Before Mitchell, C. J., Dean, Fell, Brown, Mestrezat, Potter and Thompson, JJ. Reversed.

Assumpsit on a contract.

The court entered a compulsory nonsuit which it subsequently refused to take off, WEISS, P. J., filing the following opinion:

The plaintiff was authorized and allowed by an Act of Assembly, approved April 25, 1903, P. L. 315, to bring suit in this court against the commonwealth " to recover any sum or sums of money that may be legally or justly due him."

He sued in assumpsit and in his statement claims $5,911.16 with interest from May 1, 1897, on a book account for " table supplies, wines, liquors, car fare, services, etc.," furnished to the legislature of Pennsylvania on the occasion of the excursion of that body " to New York City to attend the General Grant monument dedication ceremonies," April 27, 1897.

The claim is founded upon a contract entered into by the committee of military affairs of the senate and house of representatives of Pennsylvania with the plaintiff, claiming to act pursuant to a concurrent resolution passed by the senate and house of representatives after the same was disapproved by the governor and returned with his objections to the senate, in which it originated, and the house of representatives, and which read as follows:

" IN THE SENATE, March 25, 1897.

" WHEREAS, The dedication of a monument, erected in memory of the late General U. S. Grant in New York, occurs on April 27th, and is a matter of national importance, which the Commonwealth of Pennsylvania should suitably recognize as commemorating the life and deeds of a hero whose memory we revere ; therefore be it

" Resolved (if the House concur), That the Senate and House of Representatives attend said dedication in a body, and that all matters pertaining to such attendance be referred to the Committee of Military Affairs of the Senate and House."

The cause came on for trial and was so proceeded in that at the close of the plaintiff's testimony the defendant moved that a nonsuit be directed to be entered, which the court allowed, and the correctness of the allowance of the motion therefor is now for consideration.

The question embraces the authority of the committee of military affairs to make the contract; and if such authority is given, whether the legislature has the power to confer the authority to enter into the contract with the plaintiff.

The plaintiff urges the view that as the legislature has unlimited power to tax, so it has unlimited power to expend public moneys, except as it is restrained by constitutional ordinance.

The power to tax the subject when exercised is for public purposes, and it ought to follow that the power to expend public revenues is exercisable for public uses.

A contract authorized by the legislature ought to be expressed in clear and unambiguous terms. Nothing relating to the essence of the contract should be left to inference.

The reverence for the memory of the hero, whose monument was to be dedicated, is expressed in apt language in the concurrent resolution. So is that part of the resolution which recognizes the propriety of attendance by the senate and house of representatives at the ceremonies incident to the commemoration of the life and deeds of the great soldier. But the entertaining clause, from which the authority to contract must be derived, lacks the perspicuity which characterizes the other declarations. "All matters pertaining to such attendance be referred to the Committee of Military Affairs" is not expressive of authority to contract for food and drink. The latter are incident to sustenance, but not to attendance, as such, upon a ceremonial.

It would have been an easy task to embody in the resolution the delegation of authority to the joint committee to make the contract with the plaintiff.

It could not be said of a person who would refer all matters pertaining to a mission, not of a business character, to another, not theretofore employed by him, that authority was thereby given to bind the party referring the matters, by a contract. The very act of reference would indicate that some report should be made to him.

The resolution is silent as to the character and extent of the entertainment or the price to be paid.

If it contemplated viands it was unlimited in quantity and expenditure. It is true the intention of the legislature must be ascertained, but it must be ascertained from the context and

not from what may have been in the breasts of the legislators, or of the members of the joint committee.

Little can be predicated upon the construction put upon the resolution by the joint committee or the members of the legislature.

The testimony discloses the alacrity with which some of the members of the joint committee engaged potables immediately after its organization.

It was incurring indebtedness for personal and private objects. That the attendance was to be by the body does not stamp it with a public character. The dedicatory services were of a general public character. But the attendance by the members of the senate and house of representatives in a body was nevertheless a private or personal affair.

The effect of such construction is that public moneys are expended upon the members of the legislature attending the dedication in a body, and that by themselves upon themselves. The resolution lacks every element of authority to expend public money for public purposes, and interpretation of the resolution by themselves for their personal entertainment is not persuasive.

The vice of the resolution, so far as concerns a contract, is that it does not obligate the state to pay, or authorize it to be done, nor does it disclose the banqueting feature as an incident to the dedication, nor that public money was to be appropriated to defray the expenses incurred during the attendance.

That may have been the intention in the mind of the legislators or it may be gathered from the subsequent action of the body or committee. But the resolution itself gives no token of such a purpose and no extraneous intention can be read into it.

Nor is the Act of May 15, 1903, P. L. 406, making an appropriation for badges furnished, or " merchandise furnished " as it is generically called in the act, any aid in construing the resolution as conferring authority to contract this bill. An appropriation following the resolution would establish an analogy, but bills of appropriation made for the purpose were twice vetoed by two successive governors.

Concurrent resolutions were passed in 1899 (P. L. 407), and in 1903 (P. L. 547), authorizing the appointment of

committees to make arrangements for the inauguration of governors, who were authorized to expend a designated sum in carrying out the same and whose chairmen were required to file with the accounting department vouchers and full proofs showing the manner of disbursements, and these were followed by appropriations of moneys for the purpose (P. L. 1899, page 48, and P. L. 1903, page 534).

It is apparent that this affords no guide to the interpretation of the resolution under consideration.

A reference by the legislature of all matters pertaining to an excursion, to a committee, is too vague and uncertain to warrant the conclusion that thereby the committee was empowered to contract with the plaintiff for food and drink to be furnished on this occasion.

That the members of the legislature participated in the feast does not show that providing and serving it was contemplated by the terms of the concurrent resolution, nor does so doing bind the commonwealth.

It is against the interest of the state to sustain the doctrine that the legislature may expend public money upon a banquet provided during an attendance by the members in a body upon a dedication, public in its nature, pursuant to a resolution of reference to a committee, which in general terms embraces all matters pertaining to the attendance.

It is no hardship to require, if such power exists, that the purpose be clearly expressed, and rules of interpretation cannot be invoked, by way of enlarging authority, to transform a memorial resolution into a contract for a festival.

A reference does not imply power of final action. The resolution is ominously silent in respect of the object of the reference so far as relates to the subject-matter of this claim, or of the commonwealth's liability for anything the committee might do, or of the extent of the obligation to be incurred, or of the moneys to be appropriated therefor.

If not suppressed, all this is unexpressed. Except by ratification authority in writing is not construed into a contract by subsequent events. It is established by the instrument, and a reference of matters pertaining to an attendance upon a ceremony is at variance with power to contract a bill for food and drink which, however necessary, are not pertinent to the

attendance.    Assuming the general power of the legislature to make or authorize a contract of this kind, a safe premise to lay down is, that the contract of the authority to make it must be set forth in clear and unambiguous language and that nothing substantive can be left to conjecture.

This resolution in our opinion offends against this rule and the right of the committee to make the contract claimed must be denied.

Having failed to show authority on the part of the committee with whom he contracted, the plaintiff's claim falls.    He has no cause of action and consequently has no right of recovery from the commonwealth.    In view of the foregoing, there is no need to determine whether there is a constitutional inhibition against the making of the contract or authorizing it to be made by the legislature, and the motion to take off the judgment of nonsuit is, accordingly, overruled.

*Error assigned* was refusal to take off nonsuit.

*M. W. Jacobs* and *John E. Fox*, for appellant.—The joint committee, composed of a large number of members of both houses, construed the resolution to authorize the incurring of expenses ; a great majority of the members of both houses so construed it, as also did the legislature of 1897, by passing the vetoed bill, and the legislature of 1903, by passing the approved act.    We thus have the contemporaneous construction, which is always valuable and persuasive, " contemporanea expositio est optima et fortissima in lege " and the subsequent act, which was, not only in pari materia, but was directly interpretative :  United States v. Freeman, 3 How. 556 ; Com. v. Fraim, 16 Pa. 163 ; Big Black Creek Imp. Co. v. Com., 94 Pa. 450 ; Umholtz's License, 191 Pa. 177.

The intention of the legislature is the thing to be ascertained, and, in ascertaining it, if the circumstances so require, the courts will go beyond the letter of the legislative act, and even give the act a construction which appears to be contrary to its letter.

The resolution as the legislature construed it, and as, we submit, it ought to be construed, was within the constitutional power of that body to pass : Com. v. Mann, 5 W. & S. 403 ;

Moers v. Reading, 21 Pa. 188; Norris v. Clymer, 2 Pa. 277; Briscoe v. Bank, 36 U. S. 257; Bergner v. Harrisburg, 1 Pears. 291; Com. v. Gingrich, 21 Pa. Superior Ct. 286; Tatham v. Phila., 2 W. N. C. 564; Tagg v. Phila., 18 W. N. C. 79; Morton v. Phila., 4 Pa. Dist. Rep. 523.

The furnishing of the meals to the members of the legislature who participated in the trip was not intended as, nor was it, " compensation " for any services rendered by them: Sharpless v. Philadelphia, 21 Pa. 147.

*C. H. Bergner* and *Hampton L. Carson*, attorney general, with them *Frederic W. Fleitz*, deputy attorney general, for appellee.—It is a sufficient answer to the so-called contemporaneous construction to say that if the language used in the joint resolution does not plainly and unmistakably mean that a contract binding the state is authorized to be made by the committee of military affairs, a subsequent act of the legislature, expressly declaring that the words used shall be construed to mean that such contract could be made, would be unconstitutional: Commonwealth ex rel. Roney v. Warwick et al., 172 Pa. 140.

An act of the legislature, expressly passed for the purpose of placing upon words a meaning which the words themselves would not reasonably support, would be invalid.

A trustee has never been permitted to speculate with the estate of the cestui que trust, nor afford himself entertainment, enjoyment or profit at its expense.

Compensation to members is properly for time spent, for services performed and for personal expenses incurred for the public; but the forms of the compensation to be made to them for outlay, time and labor are the two expressly fixed by the constitution, namely, salary and mileage, which are declared to exclude all others: Buckalew on the Constitution, page 40.

OPINION BY MR. JUSTICE BROWN, January 9, 1905:

Want of authority from the state to the committees of military affairs of the senate and house to enter into a contract with the plaintiff was the reason given for the entry of the nonsuit and the refusal to take it off. If there was such authority, it is to be found in the following preamble and resolu-

tion passed over the veto of the governor : " Whereas, the dedication of a monument erected in memory of the late General U. S. Grant, in New York, occurs on April 27, and is a matter of national importance, which the commonwealth of Pennsylvania should suitably recognize as commemorating the life and deeds of a hero, whose memory we revere ; therefore be it resolved (if the house concur), that the members of the senate and house of representatives attend such dedication in a body, and that all matters pertaining to such attendance be referred to the committee of military affairs of the senate and house."

In the preamble there is not only a recognition by the people of the state, through their representatives, of the national importance of the dedication of the monument to a great soldier, but an avowal of the commonwealth's duty to suitably recognize the event. This was laudable, because it was patriotic. By the resolution action was taken, committing the state to participation in the dedicatory exercises. It was sent to the governor for his approval, because it must have been regarded by those who passed it as committing the state to it, and, if so, it was a matter in the nature of legislation. It is only such resolutions that require executive approval under section 26, of article III of the constitution : Commonwealth v. Griest, 196 Pa. 396. If both houses had simply resolved to attend the exercises in a body, and to adjourn for a day for that purpose, it would have been no concern of the governor, and they could have gone with or without his approval ; but if more was embodied in the resolution, amounting practically to an enactment authorizing special committees of the senate and house to act on behalf of the state in making suitable the recognition which both branches of the legislature had agreed upon, it was for the governor to approve or disapprove.

But the contention of the learned counsel for the commonwealth is that, even if the resolution does involve legislation, no authority to act was conferred upon the committees by the words " all matters pertaining to such attendance be referred to the committee of military affairs of the senate and house," their duty being simply to consider and report to the respective houses. This cannot be regarded as the reasonable meaning of the words. While there is no express authority given to

the committees to do any particular thing, there is, on the other hand, no direction to them to report, and that they were to act, and not simply report what further action each house should take, seems to be manifest. The resolution was first introduced in the senate. Why should it ask for a report from the committee of military affairs of the house as to what it should do, and why should the house, subsequently concurring in the resolution to attend the dedication in a body, ask for a report from the senate's committee? Both bodies had resolved to go, and referred all matters in connection with their going to a joint committee composed of the appropriate committee of each. The intention of the legislature is to be gathered not from the strained, but from the natural, meaning of the reference to the committee of all matters relating to the attendance. " All matters pertaining to such attendance " certainly included arrangements for the transportation and entertainment of the members of the legislature, and if these were referred to the committees, the common understanding would be that they were to make them. If so, the power had necessarily been conferred on the committees of contracting for such arrangements. They so understood the resolution; the plaintiff, who dealt with them, had the same understanding of it; and the members themselves intended that it should be so understood, for, without calling for or receiving any report from the committees, they accepted the arrangements that had been made for them. The failure of the learned court below to so interpret it must be regarded as error. We consider this clear, with nothing before us except the resolution itself; but subsequent legislation, while not purporting to be expository of it, unmistakably indicates the legislative understanding of what was intended by it. By an act passed at the same session, though vetoed by the governor because regarded as an improper expenditure of the public funds, an appropriation was made for the payment of the expenses incurred by the legislature " in attending the ceremonies connected with the unveiling of the monument at the tomb of General U. S. Grant." From the testimony, it appears that the only expenses incurred were for the entertainment furnished by the plaintiff and for badges supplied by J. H. Shaw. By the Act of May 15, 1903, P. L. 406, the sum of $421 was appropriated

in payment of the badges furnished by Shaw.   These acts were passed by the legislature with section 11 of article III of the constitution before it, providing that no bill shall be passed " for the payment of any claim against the commonwealth without previous authority of law." The authority of law here was the reference by the legislature of all matters pertaining to the attendance to the committees of military affairs of the senate and house.   The resolution and acts of 1897 and 1903 related to the same subject-matter, and are to be considered together in determining the legislative intention.   " The correct rule of interpretation is, that if divers statutes relate to the same thing, they ought all to be taken into consideration in construing any one of them, and it is an established rule of law, that all acts in pari materia are to be taken together, as if they were one law: Doug. 30; 2 Term Rep. 387, 586; 4 Maule & Selw. 210.   If a thing contained in a subsequent statute, be within the reason of the former statute, it shall be taken to be within the meaning of that statute : Lord Raym. 1028 ; and if it can be gathered from a subsequent statute in pari materia, what meaning the legislature attached to the words of a former statute, they will amount to a legislative declaration of its meaning, and will govern the construction of the first statute : Morris v. Mellin, 6 Barn. & Cress. 454 ; 7 Barn. & Cress. 99.   Wherever any words of a statute are doubtful or obscure, the intention of the legislature is to be resorted to, in order to find the meaning of the words : Wimbish v. Tailbois, Plowd. 57.   A thing which is within the intention of the makers of the statute is as much within the statute as if it were within the letter: Stowell v. Zouch, Plowd. 356.   The citations are but different illustrations of the rule, that the meaning of the legislature may be extended beyond the precise words used in the law, from the reason or motive upon which the legislature proceeded, from the end in view, or the purpose which was designed—the limitation of the rule being, that to extend the meaning to any case not included in the words, the case must be shown to come within the same reason upon which the lawmaker proceeded, and not only within a like reason : " United States v. Freeman, 3 Howard, 556.

A second question raised by the appellee is as to the power of the legislature to authorize the committees to make such a

contract as the one on which the plaintiff sues. The test of legislative power is constitutional restriction. What the people have not said in the organic law their representatives shall not do, they may do. It is hardly needful that authorities be cited and multiplied in support of this, but, as they seem to be unheeded whenever legislation is not in accord with the sense of right, propriety and views of those affected by it, there is nothing for us to do except to keep on repeating, even at great length, what has been said, in the hope that ultimately legislative power may be better understood.

"The constitution allows to the legislature every power which it does not positively prohibit: " Norris v. Clymer, 2 Pa. 277. "To me, it is as plain that the general assembly may exercise all powers which are properly legislative, and which are not taken away by our own, or by the federal constitution, as it is that the people have all the rights which are expressly reserved. We are urged, however, to go further than this, and to hold that a law, though not prohibited, is void if it violates the spirit of our institutions, or impairs any of those rights which it is the object of a free government to protect, and to declare it unconstitutional if it be wrong and unjust. But we cannot do this. It would be assuming a right to change the constitution, to supply what we might conceive to be its defects, to fill up every casus omissus, and to interpolate into it whatever in our opinion ought to have been put there by its framers. The constitution has given us a list of the things which the legislature may not do. If we extend that list, we alter the instrument, we become ourselves the aggressors, and violate both the letter and spirit of the organic law as grossly as the legislature possibly could. If we can add to the reserved rights of the people, we can take them away ; if we can mend, we can mar; if we can remove the landmarks which we find established, we can obliterate them ; if we can change the constitution in any particular, there is nothing but our own will to prevent us from demolishing it entirely. The great powers given to the legislature are liable to be abused. But this is inseparable from the nature of human institutions. The wisdom of man has never conceived of a government with power sufficient to answer its legitimate ends, and at the same time incapable of mischief. No political system can be

made so perfect that its rulers will always hold it to be the true course. In the very best a great deal must be trusted to the discretion of those who administer it. In ours, the people have given larger powers to the legislature, and relied, for the faithful execution of them, on the wisdom and honesty of that department, and on the direct accountability of the members to their constituents. There is no shadow of reason for supposing that the mere abuse of power was meant to be corrected by the judiciary. There is nothing more easy than to imagine a thousand tyrannical things which the legislature may do, if its members forget all their duties, disregard utterly the obligations they owe to their constituents, and recklessly determine to trample upon right and justice:" BLACK, C. J., in Sharpless v. Mayor of Philadelphia, 21 Pa. 147. "However easy it may be to demonstrate that public debts ought not to be created for the benefit of private corporations, and that such a system of making improvements is impolitic, dangerous, and contrary to the principles of a sound public morality, we can find nothing in the constitution on which we can rest our consciences in saying that it is forbidden by that instrument:" Moers v. City of Reading, 21 Pa. 188. "Nothing but a clear violation of the constitution—a clear usurpation of power prohibited—will justify the judicial department in pronouncing an act of the legislative department unconstitutional and void:" Pennsylvania Railroad Company v. Riblet, 66 Pa. 164. "To justify a court in pronouncing an act of the legislature unconstitutional and void, either in whole or in part, it must be able to vouch some exception or prohibition clearly expressed or necessarily implied. To doubt is to be resolved in favor of the constitutionality of the act. This rule of construction is so well settled by authority that it is entirely unnecessary to cite the cases:" Commonwealth ex rel. Wolfe v. Butler, 99 Pa. 535. " In creating a legislative department, and conferring upon it the legislative power, the people must be understood to have conferred the full and complete authority as it vests in and may be exercised by the sovereign power of any state, subject only to such restrictions as they have seen fit to impose, and to the limitations which are contained in the constitution of the United States. The legislative department is not made a

special agency for the exercise of specially defined legisla-
tive powers, but is intrusted with the general authority to
make laws at discretion : " Powell v. Commonwealth, 114 Pa
265. " But whatever the people have not, by their con-
stitution, restrained themselves from doing, they, through
their representatives in the legislature, may do. This latter
body represents their will just as completely as a constitutional
convention in all matters left open by the written constitution.
Certain grants of power, very specifically set forth, were made
by the states to the United States, and these cannot be revoked
or disregarded by state legislation ; then come the specific re-
straints imposed by our own constitution upon our own legis-
lature ; these must be respected ; but in that wide domain not
included in either of these boundaries the right of the people
through the legislature to enact such laws as they choose, is
absolute. Of the use the people may make of this unrestrained
power, it is not the business of the courts to inquire. We
peruse the expression of their will in the statute ; then ex-
amine the constitution and ascertain if this instrument says,
' thou shalt not,' and if we find no inhibition, then the
statute is the law simply because it is the will of the people,
and not because it is wise or unwise : " Commonwealth ex rel.
v. Reeder, 171 Pa. 505. " Prima facie, the legislative au-
thority is absolute except where expressly limited. This is
the uniform principle of all political and legal views, and of
all constructions recognized by constitutional law : " Com-
monwealth v. Moir, 199 Pa. 534. " The rule of law upon
this subject appears to be, that, except where the constitu-
tion has imposed limits upon the legislative power, it must be
considered as practically absolute, whether it operate accord-
ing to natural justice or not in any particular case. The
courts are not the guardians of the rights of the people of the
state, except as those rights are secured by some constitu-
tional provision which comes within the judicial cognizance.
The protection against unwise and oppressive legislation,
within constitutional bounds, is by an appeal to the justice
and patriotism of the representatives of the people. If this
fail, the people in their sovereign capacity can correct the evil ;
but courts cannot assume their rights. The judiciary can only
arrest the execution of a statute when it conflicts with the

constitution. It cannot run a race of opinions upon points of right, reason and expediency with the lawmaking power. . . . If the courts are not at liberty to declare statutes void because of their apparent injustice or impolicy, neither can they do so because they appear to the minds of the judges to violate fundamental principles of republican government, unless it should be found that these principles are placed beyond legislative encroachment by the constitution : " Cooley on Constitutional Limitations, ch. 7, secs. 4 and 5 (6 ed. 1890, p. 201).

Scanning the list of expressly forbidden legislation, as found in section 7, article III, of the constitution, there is no restriction upon what was done by the legislature in its action assailed in this proceeding ; nor is there any other line in that instrument by which the action is impliedly prohibited, for nowhere is such legislation, or anything relating to it, mentioned. The resolution may be regarded by some as unwise and improper, and if in any legislative district there were those so minded at the time it was adopted, and they happened to be in the majority, they had the opportunity to exhibit their disapproval, if any senator or member who voted for it came up for re-election. It is doubtful, however, if any legislative career would have been cut short for support of the measure. From time out of mind legislative bodies have, at the public expense, and with hearty popular approval, paid fitting tribute to the deserving dead, who, in peace or war, had served the state or nation ; and public money so expended is well spent for the public, for it strengthens and elevates patriotism, and helps to make better men and women of the young who witness the homage so paid. But this digression need proceed no further.

We do not understand that if the legislature had named a separate commission to represent the state at the exercises, and had provided for the payment of its expenses, the power to do so would be questioned ; but because the two bodies constituted themselves such representatives, the power is questioned, for the reason that, as the claim of the plaintiff is for food and drink furnished them, they will, if it is allowed, receive compensation in violation of section 8, article II, of the constitution, which provides that " The members of the general assembly shall receive such salary and mileage for regular and special

sessions as shall be fixed by law, and no other compensation whatever, whether for service upon committee or otherwise."

Proper entertainment of the legislature was not merely incidental to its attendance at the dedication, but was necessary, and, therefore, formed part of the state's expenses in making suitable recognition of the ceremony. The concurrent resolution contemplated the payment of nothing but such expenses, and their payment to the man who furnished what was so necessary cannot be regarded as compensation or pay to the members of the legislature for their services as legislators in any sense, whether such strained meaning for " compensation " be searched for in dictionary or encyclopedia of law, or the word is to be interpreted as popularly understood.

It is conceded by the learned and able counsel for appellee that the payment of the expenses may not be technically compensation, and yet, by the process of reasoning through which they would have us declare it to be compensation within the constitutional prohibition, the very ink furnished to senators and members, and the pens dipped into it in answering the daily inquiries of constituents, would have to be regarded as constitutionally unlawful compensation to them, if paid for by the state.

The payment of expenses by the state in having itself fittingly represented, when it ought to be represented on great public occasions, involves nothing but the maintenance of its own dignity ; and who shall represent it, or how it shall be represented, is for the legislature alone. If in their judgment its members, representing every portion of the state, ought to do so, who can better represent the commonwealth, and when they do so, what legislative service are they rendering for which they are receiving forbidden compensation because the state pays the expenses necessarily incident to its representation ? The state is often represented by commissions created by the legislature, composed in part of members of the senate and house, but no one has ever thought of asking a court to say that those members of such a commission who happen to be senators or representatives receive prohibited compensation because their hotel bills are paid with those of the other members of the commission out of the appropriation for the payment of its legitimate expenses. That members of a legislature may

be only part of such commission, instead of as one body being
the state's sole representative, can make no difference in prin-
ciple, if the position taken by the appellee is to be sustained.
It has not been very elaborately pressed by the learned counsel
representing the commonwealth, and we need not discuss it
further.

In disposing of the questions raised on this appeal, we have
nothing to do with the appellant's claim as presented in the
court below; and it would, therefore, be improper for us to
say anything about it.   If, after it shall have been passed upon
by a jury, the plaintiff or defendant should feel aggrieved by
the finding, and the court below should not correct any wrong
that may be done, the alleged grievance may be the subject of
another appeal.   All that we now decide is that, by the act
authorizing the appellant to sue the commonwealth, he is to
recover such sum as under the rules of pleading and evidence
may be justly due him.   Under these rules the case must be
tried, and such sum awarded to him as, under proper instruc-
tions from the court and under all the proofs, the jury may find
to be just.

Judgment reversed and procedendo awarded.

MR. JUSTICE MESTREZAT and MR. JUSTICE POTTER dis-
senting :

That there may be no doubt as to the claim for which this
action was instituted and the items of which the majority of
this court says are chargeable against the commonwealth of
Pennsylvania, we state the claim in the language of the plain-
tiff himself, as found in his statement, as follows :

" Legislature of Pennsylvania,
        " Excursion to New York City
             " General Grant Monument Dedication.
                  " To James Russ, Dr.
" 1887
     "April 27, To table   supplies . . . . . . . . . . $1,678.36
                      wines   and   liquors . . . . . . .   3,026.60
                      supper at Dooner's for Com.      61.90
                      J. H. Riebel, cigars . . . . . .   450.00
                      hire of china and breakage .   187.53
                      employees' services . . . . . .   240.00

| | | | |
|---|---|---:|---:|
| Amount brought forward | . . . . . . . . . . . . | $5,644.39 | |
| | car fare . . . . . . . . . . . . . . | 202.50 | |
| | purchase of stoves . . . . . . . | 70.00 | |
| | freight charges . . . . . . . . . | 8.75 | |
| | James Russ, incidental expenses . . . . . . . . . . . . | 175.00 | |
| | | $6,100.64 | |
| "Cr. | By liquors returned . . . . . . . . | 157.00 | |
| | sale of stoves . . . . . . . . . . | 32.00 | 189.00 |
| | | $5,911.64 | |

The edibles and drink were furnished as a lunch and dinner, both meals being served between the hours of 11 : 30 A. M. and 6 P. M., on the boat which carried the legislative excursionists on the Hudson river from Jersey City to a point opposite the Grant monument, a distance of ten miles or less, and back. There were 425 persons, of which number 253 were members of the legislature. Relative to the meals and liquors furnished, Senator Krause, chairman of the joint committee to make arrangements for the excursion, testifies as follows : " Q. Tell us what he (Russ) furnished. A. He furnished the lunch; as soon as we arrived at Jersey City and got on the boat there was a very nice lunch prepared for us. Q. Go on and state what else Mr. Russ did. A. After the ceremonies were over he furnished an elegant dinner for us, with wines and liquors and everything included, with the cigars; had cigars going on the train, cigars on the boat, and everything in first-class order. Q. Do you remember the kind of wine that was furnished ? A. White Seal; wasn't any too good for the members of the legislature, we thought. Q. Do you remember what else was furnished, can you tell what was furnished in the way of food for the dinner ? A. Oh, it was so fine that I forget exactly all the elegancies that we had; we had everything first class. Q. Can you tell us what other liquors were furnished ? A. Liquors of all description. Q. Describe them; tell what they were. A. We had plenty of whisky, and we had plenty of beer and plenty of appollinaris; I don't know how many drank apollinaris, but apollinaris was furnished.

Q. Did you specify what liquors? A. Yes, sir; as far as the wines were concerned, because that was a motion unanimously carried in the committee. Q. You did not specify anything with respect to the whisky, beer or cigars? A. Oh, I told him we wanted all those things. Q. I understand, generally speaking, senator, that you ordered nothing special from Mr. Russ except the wine? A. That is all. Q. You left it to his discretion? A. That is right."

John Riebel, a cigar manufacturer of Philadelphia, was a member of the military committee of the house as well as of the joint committee to arrange for the excursion. He was called as a witness by the plaintiff and testified that the joint committee, about three fourths of which were present, held a meeting in Philadelphia the night before the excursion, and that Mr. Dooner served them with a lunch for which a charge is made in the plaintiff's bill. He further testified: "Q. Can you tell what he (Russ) gave to you as lunch? A. Only a first-class lunch; I can't begin to enumerate what articles he had there, or what food he had there; a first-class lunch in every respect. Q. State whether he provided anything else. A. On our return back he had supplied one of the finest dinners a man wanted to sit down to, served on the boat, had all the elegancies of the season, anything you can mention in the eatable line almost."

As to the contract made with him by Senator Krause and what was furnished in pursuance of it, the plaintiff testifies: "Q. What did he say to you when he came there? A. He told me he wanted a first-class layout, everything up to date, and I did so. Q. What did he tell you he wanted as to the number of meals if anything? A. Well, a lunch the moment we got on the boat and a dinner returning towards New York—Jersey City. Q. What did he (Krause) say? A. He said I should go ahead and make all arrangements, and especially the one thing that they (the committee) put out especially was 'White Seal champagne.' Q. (Mr. Fox) now can you state what you did furnish? A. Oh, Lord, I furnished everything, they had a nice lunch and very fine dinner. Q. Now about how much a head did you calculate to charge? A. I did not calculate at all, there was no price whatever, if it cost $5,000,000 there was no price at all that was to it. Q. In

other words, there was no limit put on the cost? A. No, sir; not a cent. Q. You don't know the kind of liquors returned? A. No. Q. Do you know the price charged for the returned liquors? A. Just that much there; it was very lucky any was returned at all."

The only basis for this claim of $5,911.16 against the state for table supplies, wines and liquors, cigars and " incidental expenses " (about one half of the claim, it will be observed, being for wines and liquors) is a joint resolution passed by the senate and house of representatives over the veto of the governor in which it is resolved " that the senate and house of representatives attend said dedication (of the General Grant monument in New York) in a body, and that all matters pertaining to such attendance be referred to the committee on military affairs of the senate and house." The learned trial judge held that this resolution conferred no authority on the committee to make a contract with the plaintiff for the items charged in his bill, and hence he had no valid claim against the state. For the reasons set forth at length in the opinion refusing to take off the nonsuit, we entirely concur with the conclusion of the court below, and would affirm the judgment.

It does not aid the position of the majority of the court to cite authorities to sustain the proposition, conceded to be the settled rule in all the states of the federal union, that the power of the general assembly of a state to legislate is absolute, subject only to the restrictions and limitations imposed by the constitution of the state and that of the United States. That principle is not controverted, but it is most strenuously denied that the legislature, by the joint resolution in question, gave authority to the committee on military affairs to bind the state by a contract to pay the plaintiff the claim for which this action was brought. It is apparent that the language of the resolution conferred no direct authority on the committee to enter into a contract to bind the state for any expense incurred by the legislature in attending the dedicatory exercises. If any authority to contract for such purpose is given, it is by implication and that alone, and not being necessarily implied from the power conferred upon the committee by the joint resolution, the court should not sustain it on that ground. The character of the claim conclusively rebuts any implication that

the legislature in passing the resolution intended to authorize the committee to make a contract for it. Such interpretation of the resolution opens the door to raids upon the state treasury by committees of the legislature by which the taxpayers of the state can be made to pay claims which, as in this instance, the general assembly of the commonwealth or no other self-respecting legislative body, would for one instant think of approving. Had the plaintiff's claim, the character of which is shown by the items thereof and the testimony, been presented to the senate and house in open session at the time the joint resolution was passed, we are satisfied that those bodies would not have authorized the committee to contract for or pay it. It would have shocked the legislative conscience, as well as that of the people of the commonwealth. The testimony leaves no doubt as to the purpose in view when the contract was made and what was expected to be, and what was, furnished in pursuance of it. About seventeen hundred dollars' worth of food and three thousand dollars' worth of wines and liquors were consumed on the steamer by the 425 guests of the state in six and one-half hours. This tells the brief but comprehensive story of the manner in which the money claimed here was applied (in the language of the preamble to the joint resolution) " in commemoration of the life and deeds of a hero whose memory we revere." Further comment upon the subject is unnecessary. To hold that authority was conferred upon the legislative committee by the concurrent resolution to contract for such a claim, is violative of all sound rules of interpretation, and is not supported by reason or authority.

We would, moreover, take a step further than the trial court and hold that the legislature was prohibited by the constitution from authorizing the committee to make the contract under which this claim is made against the state. Article 2 of section 8 of that instrument provides: " The members of the general assembly shall receive such salary and mileage for regular and special sessions as shall be fixed by law, *and no other compensation whatever, whether for services upon committee or otherwise.* No member of either house shall, during the term for which he may have been elected, receive any increase of salary, or mileage, under any law passed during such term," At the time of the excursion to New York, the mem-

bers of the legislature were receiving as compensation a salary and mileage fixed by law and hence under this constitutional provision they could receive "no other compensation whatever." Equally explicit and mandatory is the provision that no member shall "receive any increase for salary or mileage under any law passed during the term" for which he is elected. Mr. Buckalew, a recognized authority upon the interpretation of the constitution, says (Constitution 40) : "Compensation to members is properly for time spent, for services performed and for personal expenses incurred for the public ; but the forms of the compensation to be made to them for outlay, time and labor are the two expressly fixed by the constitution, namely, salary and mileage, which are declared to exclude all others." A member of the legislature is therefore confined to his salary and mileage as compensation for his services, in neither of which is the claim here presented included. The joint resolution shows that the members attended the dedication as a legislative body, and the claim for the edibles, liquors, cigars, etc., furnished by the plaintiff is "other compensation" to the members of the legislature than salary and mileage and therefore is clearly within the constitutional inhibition. If the sum claimed by the plaintiff had been paid by the state to the members to defray their expenses in attending the dedication, it would clearly have been additional to the compensation allowed them by law. The practical effect of a payment by the state direct to the plaintiff is the same as a payment of the amount to the members and by them to the plaintiff. In either case, they receive an additional compensation from the state for their services as members of the legislative body to which they belong.