other partner, be conclusive as to the property involved.

[3, 4] After the rendition of the divorce decree the relation of Mrs. Gabb to the land then in controversy in the suit between the Farrells and her husband could not be superior to that of a lis pendens purchaser. She ,was accordingly concluded by the judgment therein rendered upon the cause of action pending against her husband at the time she obtained her divorce. As the purchaser pending the action of B. F. Farrell's claim to the land, Cobb was entitled to intervene in the suit of the Farrells against Ochse. Fleming v. Seeligson, 57 Tex. 524. The cause of action asserted by him against Ochse under his intervention was the same that the Farrells were urging when the divorce decree in Mrs. Gabb's favor was rendered, namely, that he had obtained the deed from B. F. Farrell through fraud and thereunder acquired no title to the land. Cobb's intervention did not change the cause of action. It simply made a new party to it. Morales v. Fisk, 66 Tex. 189, 18 S. W. 495. A conclusive test of the identity of causes of action raised by different pleading is whether a judgment under the original pleading would bar recovery under the other. With Cobb's intervention seeking a cancellation of the same deed, upon the same ground, and under a right acquired from B. F. Farrell pending the suit, there can be no question but that a recovery by Farrell would have been a bar to Cobb's action.

The defendants purchased in reliance upon the title decreed Cobb in the suit against Ochse without notice of anything that would adversely affect the title as thus decreed, and should be protected in it. Mrs. Gabb abandoned all claim to the land, as ,was recited in the divorce decree. She knew of the pendency of the suit by the Farrells for the land. If,she had desired to re-assert a claim to the land, she should have done so in that suit following her divorce. Instead, she stood by and permitted the judgment in Cobb's favor to be rendered. She ought not to be permitted to speculate upon the issue of that controversy and then assert her claim in a different action. She was concluded by the judgment rendered in Cobb's favor against her former husband. The Court of Civil Appeals correctly determined the case. Its judgment is affirmed.

---

TERRELL, Comptroller, v. MIDDLETON.
(No. 10014.)

(Supreme Court of Texas. March 28, 1917.)

On motion for rehearing. Motion overruled in 191 S. W. 1138.

See, also, 187 S. W. 367, for decision in Court of Civil Appeals.

Pat M. Neff, of Waco, and White, Cartledge & Wilcox, of Austin, for plaintiff in error.

PER CURIAM. Rehearing denied.

HAWKINS, J. (concurring). Speaking for myself only, I think that the motion for rehearing should be overruled, for the reasons stated in my concurring opinion in this case, filed February 20, 1917. 191 S. W. 1138. Having carefully considered said motion during the preparation of said opinion, it was not my purpose to write again in the case; but several features of the opinion of this date by Mr. Justice YANTIS, dissenting from the order of this court overruling said motion, impel me to say what follows: Because I did not consider section 48 of article 3 of our state Constitution applicable, I did not, in my former opinion, discuss that section; but, now that one member of this court has pointed to section 48, alone, as affording constitutional sanction for such appropriations and for such expenses, I feel called upon to say now, specifically, that in that section I can find nothing whatever which conflicts with any of my views or conclusions as set out in my said former opinion.

Section 48 relates, primarily, to the raising of state revenues, and only in a secondary and inferential way does it relate to the making of appropriations or to the incurring or payment of expenses of any kind. The making of such appropriations from the state treasury and the manner of incurring expenses upon the faith and credit of the state, and payment thereof, are treated, specifically and directly, by other sections of our Constitution, as pointed out by me in said former opinion, and to such other sections we must turn to find express restrictions upon the power of the Legislature to make such appropriations and upon the power to incur or pay such expenses. It is but a platitude to say that those express and specific and unambiguous restrictions, as far as they go, control all implications of section 48 as to such appropriations and such expenses. Consequently, the right of the Legislature to appropriate revenues "sufficient for the economical administration of the government" and for the payment of "all officers, agents, and employés of the state government, and all incidental expenses connected therewith" which right is recognized, by implication, in section 48, clearly is subordinate to, and, very plainly, is controlled by, such other more direct and more specific constitutional provisions, such, for instance, as section 5, of article 4, which carries a very obvious limitation upon not merely the "salary," but upon the entire "compensation," of the Governor, and section 44 of article 3, which certainly inhibits all expenditures not provided for "by pre-existing law," all as pointed out in my former opinion.

Moreover, the right of the Legislature to make appropriations to cover whatever properly and fairly may be considered and treated as "incidentals," as that word stands in section 48, which right, as hereinabove indicated, is declared only inferentially, by the section, is, in the present case, a purely abstract and merely academic matter, because none of the appropriations or expenses in controversy falls within such designated class, as being "incidental" to the Governor's official duties, and none of said expenses was authorized by any valid pre-existing law. That much is clear as matters of law. My views upon those features of this case are set out at length in said former opinion. I refer to them here solely for the purpose of developing, very briefly, my idea of the meaning and legal effect of section 48, which was not there discussed.

With the exception of his views as to section 48 of article 3, said dissenting opinion is, in substance, but little more than a reflex of said motion, and I will not attempt to answer it in detail; however, I trust that I may be pardoned for the following observations:

A sufficient reason for voting down in the constitutional convention the quoted resolution denying to the Governor "fees or perquisites or extra compensation" probably was that, already, the subject had been exhausted in section 5 of Article 4. Evidently said dissenting opinion was not then anticipated. The logic of my distinguished dissenting Associate leads, inevitably, to the conclusion that the Legislature is entirely free to provide by law for the Governor "fees" and "perquisites," if not "extra compensation," in the widest possible range and in unlimited amounts, and is also free to make like unrestricted appropriations for any and all other officers, agents, and employés of the state government. At that view of the legal effect of our Constitution its framers doubtless would now stand aghast. I do. Upon that point, as related to appropriations and expenses for the Governor, such as those here in controversy, a sidelight is found in section 22 of article 4 of our Constitution which provides, with reference to the Attorney General:

"He shall receive for his services an annual salary of two thousand dollars, and no more, besides such fees as may be prescribed by law: Provided, that the fees which he may receive shall not amount to more than two thousand dollars annually."

The contemporaneous omission from section 5 of article 4, prescribing the "compensation" of the Governor, of any provision for "fees" for the Chief Executive, is very significant, and indicates, unmistakably and sufficiently, an intent to prohibit the Legislature from granting or allowing to the Governor any such fees, just as the provision in section 5 of article 4 that he "shall have the use and occupation of the Governor's mansion, fixtures and furniture" indicates an intent that he shall not be allowed any other "perquisites" whatever.

I decline to be bound by the decision of the Supreme Court of Nebraska in State v. Sheldon, 78 Neb. 552, 111 N. W. 372, because I regard it as clearly erroneous, and the same remark applies to the decision of the Pennsylvania Supreme Court in Russ v. Commonwealth, 210 Pa. 544, 60 Atl. 169, 1 L. R. A. (N. S.) 409, 105 Am. St. Rep. 825. In the matter of appropriations the Constitution of Pennsylvania is far less restrictive than ours.

The quoted provision of the Constitution of the United States (Const. art. 2, § 1) relative to the "compensation" of the President fixes no limit in the amount thereof; and if the stated appropriations thereunder have ever been tested in the courts, that fact has not been pointed out.

The actions of the district court, and of the Court of Civil Appeals, and of the Supreme Court, in this case, involve no judicial review of, or control, or attempt or purpose to control, executive or legislative discretion in any matter in which those departments are either authorized or permitted by our Constitution to act, to the extent of incurring and paying the expenses in controversy, and such judicial action does not impugn the motives of any member of either of those departments. Such judicial action is entirely consistent with the usual presumption that all members of those departments who have acted in the premises did so in good faith and upon the belief that said appropriations and expenses were not obnoxious to our Constitution, but valid in all respects, just as the dissenting member of this court now acts and believes. The issues presented in this case do not involve the motives of any one; they are questions of law, arising upon uncontroverted facts, tested by our state Constitution. In any event the issues should remain unclouded.

YANTIS, J. (dissenting). This was an injunction suit instituted in the Fifty-Third district court of Travis county, Tex., by one W. C. Middleton, a citizen of Rains county, Tex., who sued as a citizen and taxpayer of the state to restrain H. B. Terrell, comptroller, from issuing warrants to pay certain items for which an appropriation had been made by the Legislature in favor of Governor O. B. Colquitt, to defray certain mansion expenses incurred by him while he was Governor of Texas.

The following terse statement of the case is copied from the argument of plaintiff in error:

"The Thirty-Third Legislature at its first called session appropriated for the Governor's mansion and grounds, among other things, the following: 'Fuel, lights, water, ice, groceries and incidentals for the year ending August 31, 1914, $2,000.00, and for the year ending August

31, 1915, $2,000.00.' Acts First Called Session, Thirty-Third Legislature, page 113. The appropriation for the year 1915 having been exhausted, the Thirty-Fourth Legislature at its first regular session by section 3 of the act approved February 12, 1915, made an appropriation to cover certain deficiencies, among which was the following: 'For Governor's mansion, water, fuel, lights, etc., $1,500.00.' Acts of the Regular Session, Thirty-Fourth Legislature, page 14. There is no contention that the deficiencies for which said deficiency appropriation was made were not authorized and created in the usual and ordinary way provided by law, but the contention is made that the appropriation bills above referred to, upon their faces, show that they were made for the purpose of increasing the salary of the Governor of this state, and are in contravention of section 5, article 4, of the Constitution of this state, and are therefore void. It is admitted that the deficiency appropriation of $1,500.00 was made for the purpose of paying the claims offered in evidence in this case by the defendant in error, and no contention is made that any of the claims involved in this suit were not covered by and intended to be paid out of the said $1,500.00 deficiency appropriation. The court below found and held that the claims of the city of Austin for water and light, the claim of Voss & Koock for various kinds of dishes, the claim of C. A. Dahlich for furniture, carpets, etc., the claim of M. B. King for cleaning flues in the mansion, and the claim of the United Telephone Company and the Southwestern Telephone Company were valid claims and dissolved the injunction granted herein as to said claims, and found and held that the following claims are invalid because they were for purposes not authorized by the Constitution, to wit, increase in the Governor's salary: The Driskill Hotel Company's claim for chicken salad, olives, almonds, coffee, sugar, meat, lettuce, waiters, helpers, punch, etc.; Tobin's Book Store claim on account of printing invitations, etc.; Maerki's Bakery claim for bread, etc.; Excelsior Meat Market claim for meat; Bryant Brothers' claim for horseshoeing; W. J. Foster's claim for fruits, vegetables, etc. The Consumers' Fuel & Ice Company claim for ice was by the court below held to be invalid, and an injunction heretofore granted in this case was perpetuated as to such claims."

Middleton alleged in his original petition that said appropriation was illegal and void because it was an attempt to increase the compensation of the Governor of Texas, which was contrary to section 5 of article 4 of the Constitution of the state of Texas. This article of the Constitution reads as follows:

"Sec. 5. [Governor's Salary and Mansion.] He shall, at stated times, receive as compensation for his services an annual salary of $4,000.-00, and no more, and shall have the use and occupation of the Governor's mansion, fixtures and furniture."

Later, by amended petition, he alleged that the appropriation was illegal because unconstitutional for the following additional reasons:

Because in violation of section 3 of article 8 of the state Constitution, which is as follows:

"Taxes shall be levied and collected by general laws and for public purposes only."

And because in violation of the following portion of section 51 of article 3 of the state Constitution:

"The Legislature shall have no power to make any grant, or authorize the making of any grant, of public money to any individual, associations of individuals, municipal or other corporations whatsoever."

And because said appropriation is in violation of section 3 of article 1 of the state Constitution, which is as follows:

"All free men, when they form a social compact, have equal rights, and no man, or set of men, is entitled to exclusive separate public emoluments, or privileges, but in consideration of public services."

Among other defenses pleaded by Terrell, who was defendant in the district court, and who is plaintiff in error here, in his motion to dissolve the temporary injunction, was that each item of indebtedness shows on its face to be a debt against the state created prior to said writ of injunction by the authority of article 4342 of the Revised Civil Statutes of Texas, and by the authority of the appropriation bill, passed by the Thirty-Third Legislature, appropriating money for the following purposes, to wit:

"Fuel, lights, water, ice, groceries, and incidentals for the Governor's mansion and grounds."

And that the Legislature of the state of Texas had prior to the issuance of the injunction passed upon the legality of said indebtedness, and that the same is not now subject to review by a co-ordinate branch of the government. Also it is contended by the plaintiff in error, Terrell, in the petition for writ of error, that the items of the indebtedness, the payment of which is sought to be restrained, were authorized by that portion of section 48, article 3, of the state Constitution, which provides that the Legislature shall have the right to levy taxes and impose burdens upon the people in the "payment of all officers, agents and employés of the state government, and all incidental expenses connected therewith"; and that the items of the indebtedness, the payment of which is sought to be restrained, were incidental expenses of this nature.

The ruling of the trial court was as indicated in the above quotation from the statement contained in the argument of the plaintiff in error. As to some of the items, as indicated therein, the writ of injunction was granted, and as to other items, as indicated therein, the writ of injunction was denied.

Appeal was taken by Terrell, as appellant, from the judgment of the district court to the Court of Civil Appeals. There a decision was rendered adverse to the contentions of Terrell, affirming the judgment of the district court. (Civ. App.) 187 S. W. 367. The case was brought here on application of Terrell, the plaintiff in error, who sought to have the judgment of the Court of Civil Appeals reviewed, and its judgment reversed. This court acted upon said application for a writ of error on a prior day of the present term of this court, and refused to grant the writ of error, being of the opinion that the appro-

priations were in violation of the Constitution. I concurred in that view. Since that action by this court a motion for a rehearing has been presented requesting that we again consider the questions. I have reinvestigated all the questions presented, and have reached a different conclusion upon some of them. I now incline to the view that the appropriations were not in violation of the Constitution, for reasons which I will indicate herein, and I believe that justice will be promoted by granting the writ and submitting the case for a full hearing upon oral argument by attorneys for both sides of the controversy. Justice cannot suffer by such a course, and I can see no good reason for denying to the parties a full hearing upon oral argument.

Does section 5, article 4, of the state Constitution, quoted above, which provides that the Governor shall "receive as compensation for his services an annual salary of $4,000.00, and no more, and shall have the use and occupation of the Governor's mansion, fixtures and furniture," mean to prohibit the Legislature from appropriating at its will other perquisites than the "use and occupation of the Governor's mansion, fixtures and furniture"? And does the use of the phrase "and no more" amount to such prohibition? As I understand it, the expression "and no more" relates entirely to the Governor's salary. He shall receive "an annual salary of $4,000.00, and no more," clearly means and no more salary. That is its plain, grammatical, unambiguous meaning. Its grammatical sense should be followed in construction unless 'a different meaning clearly appears by the use of the words employed. Section 408, Lewis' Sutherland Statutory Construction. Such grammatical meaning is clearly recognized by the petition of Middleton, which specifically alleges that said appropriation is "an attempt to increase the compensation of the Governor of Texas." It might be noticed here that not a word of evidence was introduced by Middleton to prove such ulterior purpose and motive on the part of either the Legislature which passed the appropriation, or of Governor Colquitt in using the money appropriated.

But it is argued by attorneys for Middleton that the portion of said section which provides "and shall have the use and occupation of the Governor's mansion, fixtures and furniture" is exclusive, and prohibits the Legislature from granting to the Governor any other perquisites than the ones mentioned. This is undoubtedly the general rule. The maxim "Expressio unius est exclusio alterius" is generally followed as a rule of construction, but like all rules it has many exceptions. One of the exceptions is that "if there is some special reason for mentioning one, and none for mentioning a second which is otherwise within the statute, the absence of any mention of the latter will not exclude it." Section 495, Lewis' Sutherland Statu-

tory Construction. A special reason existed, perhaps, for mentioning the use and occupation of the Governor's mansion, fixtures, and furniture, in the fact that the state owned this property, and the members of the constitutional convention wished the Governor of Texas to occupy the mansion rather than to live in private quarters; they wished him to live, not in the plain simple residence of an humble citizen, but in the Governor's mansion, in order to live in keeping with the exalted office of Governor of a great state. No such special reason existed for the mention of other perquisites of a similar nature. As indicating that the members of the constitutional convention did not wish to exclude other perquisites, there stands out prominently in the proceedings of the convention the fact that after section 5 of article 4 of the Constitution, as it now exists, had been agreed upon, Mr. Crawford, one of its members, offered the following resolution:

"He [the Governor] shall receive no fees or perquisites or extra compensation for the performance of his duties connected with his office."

This resolution is shown to have been lost, Journal of the Constitutional Convention, page 287. Neither the expression "and no more" following the salary provision, nor the clause which provides "and shall have the use and occupation of the Governor's mansion, fixtures and furniture," could possibly be given the effect of excluding all other kinds of appropriations for the Governor, because the Constitution itself clearly provides in section 48 of article 3 for the payment of all incidental expenses connected with the office of Governor, and with the state government. All this, it seems to me, makes the question one of grave doubt as to whether the mention of the use and occupation of the mansion, fixtures, and furniture excluded all other perquisites, and amounted to a clear command to the Legislature not to appropriate any similar perquisites, or any perquisites to the Governor, but to restrict him entirely to the salary of $4,000 per year.

It is an unbroken rule of authority, and it will not be contended by any one to the contrary, that the Legislature would have unrestrained power to appropriate all kinds of perquisites to the Governor unless there is a clear command by the Constitution itself for the Legislature to refrain from so doing. Unless there is a plain "thou shall not" in the Constitution the Legislature may act at its own discretion, and according to its own wishes. It occurs to me that section 5 of article 4 is not such a command. Especially is this true when section 48 of article 3 affirmatively authorizes the Legislature to levy taxes and impose burdens upon the people "to raise revenue sufficient for the economical administration of the government." This unreservedly commits to the discretion of the Legislature all appropriations which in its opinion the Legislature considers neces-

sary for the economical administration of the government. It is therefore a matter of discretion with the Legislature as to what appropriations they will make for the administration of the government, except where the Constitution has specifically provided a limitation upon the exercise of such discretion.

If the Legislature's act was valid, and directly authorized by the portion of section 48 of article 3, which provides for the payment of "all officers, agents and employés of the state government, and all incidental expenses connected therewith," then it inevitably follows that the other sections of the Constitution relied upon by the defendant in error, and quoted herein, to render the appropriation in question unconstitutional, cannot possibly be given effect.

The question then turns upon the legality of the appropriation by the Legislature to cover the incidental expenses complained of. And in considering that question we are brought at once to the consideration of the question as to whether the judiciary, a co-ordinate branch of the government, can revise the discretion once exercised by the Legislature, another co-ordinate branch of the government. Many well-recognized authorities hold to the view that the courts have no power to inquire into or revise the decision of the Legislature upon a question where it has exercised its discretion, there being nothing upon the face of the act passed by them to show their act to be repugnant to some provision of the state Constitution. Upon this question Ruling Case Law, a standard authority, volume 6, § 112, says:

"The constitutionality of a law is not to be determined on a question of fact to be ascertained by the court. If under any possible state of facts an act would be constitutional, the courts are bound to presume the facts exist; and therefore the courts will not make a separate investigation of the facts, or attempt to decide whether the Legislature has reached a correct conclusion with respect to them."

Also see sections 109, 110, and 111, volume 6, Ruling Case Law. Also see Cyc. vol. 8, pp. 727, 736, 737, and 738.

To the same effect is the holding of this court in the case of March v. State, 44 Tex. 79, in which this court, speaking through Mr. Associate Justice Ireland, said:

"It is a principle that has become axiomatic that, when a discretion is confided to any one branch of the government, a decision by that department upon that particular point cannot be questioned or revised."

It must also be considered that in passing the appropriations which are attacked the Legislature was compelled to pass upon the facts in order to determine whether the items appropriated were incidental expenses of the Governor or connected with the state government, or whether they were in fact the private expenses of the Governor, and not connected with him as an officer or with the state government as such. Can the courts inquire into the facts when the Legislature, a co-ordinate branch of the government, has done so, and decide the question of fact and take action thereon? Every person knows that the higher courts may revise questions of fact decided by juries and judges, because this is authorized by the Constitution. But there is no constitutional provision which authorizes the courts to inquire into and revise the findings of facts by the Legislature. One cannot appeal from an adverse ruling upon the facts by the Legislature, to the courts for redress. When it is appropriate for the Legislature to consider the facts while passing legislation their finding upon such facts is final. The rule is well stated by the author of Ruling Case Law, vol. 6, § 111, which is as follows:

"On frequent occasions the constitutionality of a statute depends on the existence or nonexistence of certain facts. In view of the presumption in favor of the validity of statutes, it must be supposed that the Legislature had before it when the statute was passed any evidence that was required to enable it to act; and if any special finding of fact was needed in order to warrant the passage of the particular act, the passage of the act itself is treated as the equivalent of such finding. The validity of legislation which would be necessary or proper under a given state of facts does not depend on the actual existence of the supposed facts. It is enough if the lawmaking body may rationally believe such facts to be established. Under the American system of government by the people through their chosen representatives, practical legislation admits of no other standard of action. The fact that the finding of the Legislature is in favor of the truth of one side of a matter as to which there is still room for difference of opinion is not material. What the people believe is for the common welfare must be accepted as tending to promote the common welfare, whether it does in fact or not. It has been said that any other basis would conflict with the spirit of the Constitution, and would sanction measures opposed to a Republican form of government. As a general rule, therefore, it may be stated that the determination of facts required for the proper enactment of statutes is for the Legislature alone, that the presumption as to the correctness of its findings is conclusive, and that the courts do not have jurisdiction or power to reopen the question or make new findings of fact."

Also see section 84, vol. 6, Ruling Case Law, and section 497, vol. 2, Lewis' Sutherland Statutory Construction.

But the contention by the defendant in error is, as shown in the quotation herein made from his petition, that the appropriation was made for the purpose of increasing the Governor's salary to a sum in excess of $4,000. Can the purpose, design, and motive of the Legislature in passing a bill, or of Governor Colquitt in using the funds appropriated, be inquired into? Can the courts go behind an act of the Legislature to inquire into the motives which prompted members of the Legislature, or the motives which prompted individuals, in instigating such legislation? Undoubtedly they cannot. The rule is stated in volume 6, § 110, Ruling Case Law, thus:

"If a statute appears on its face to be constitutional and valid, the courts cannot inquire into the motives of the Legislature, or the intention of those who enacted it, except to the

extent that these may be disclosed on the face of the acts, or inferable from their operation."

Also see sections 109, and 111, and see section 497, Lewis' Sutherland Statutory Construction.

Returning to the question whether the appropriation which is attacked is in violation of section 5, article 4, of the Constitution, which covers the salary question, I call attention to the fact that every Legislature which has convened since the adoption of the Constitution, in the passing of appropriation bills, has construed said article of the Constitution as not prohibiting the granting of benefits and perquisites to the Governor of the state. The first Legislature after the adoption of the Constitution appropriated $100 per year for "gas for the Governor's mansion," and a similar appropriation has been carried by every Legislature which has convened since the adoption of the Constitution. The second Legislature which convened after the adoption of the Constitution appropriated $400 per year for gardener, $2,000 per year for wood, lights, etc., and $200 contingent fund each year for the mansion. These appropriations in almost the identical language have been carried in every appropriation bill of every Legislature since. In 1881, and in 1883, the Legislature appropriated $500 for each of the two years for "labor to keep executive mansion and grounds in order, and other contingent expenses." This item has been carried in every appropriation bill of each Legislature since the adoption of the Constitution. In 1884 an appropriation was made for telephones, and that item has been constantly carried in all appropriation bills by subsequent Legislatures. In 1887, $100 was appropriated for water for the mansion. That item has uniformly been carried by every Legislature that has convened. During Governor Ross' administration the Legislature appropriated for freight, postage, and telegraphing for the Governor's mansion $800 per year, and in addition $300 per year for contingent expenses. During Governor Hogg's administration the Legislature appropriated $125 each year for water and ice for the Governor's mansion, $20 for repairing and tuning the piano, and $300 contingent expenses each year. Under Governor Culberson's administration, which was one of the most economical administrations had in Texas, $1,000 was appropriated for postage and telegraphing; $3,000 for Governor's mansion and furniture, including repairs to mansion and grounds; $1,000 for gardener and labor in keeping up grounds; $400 for water and lights for mansion; $600 for housekeeper for mansion; $900 for fuel and lights; $400 contingent expenses. The appropriations mentioned, or some such similar appropriations, have been constantly carried, as asserted by counsel for the plaintiff in error, in every appropriation bill since the Constitution was adopted.

This amounts to a legislative construction of section 5, article 4, of the Constitution, as not prohibiting that character of appropriations for the mansion and grounds. The Legislature so construed it in every session from the time of its adoption by the constitutional convention in 1876 until the present time. The courts of the country uniformly hold that such a legislative construction is of great value in passing upon the constitutionality of a law where the question involved is doubtful. Lewis' Sutherland Statutory Construction, § 472. In the case of Trigg v. Pennsylvania, 41 U. S. 639, 10 L. Ed. 1060, the United States Supreme Court, speaking through Mr. Justice Storey, said:

"If the question were one of doubtful construction, such long acquiescence in it, such contemporaneous expositions of it, and such extensive and uniform recognition of its validity, would in our judgment entitle the question to be considered at rest; unless, indeed, the interpretation of the Constitution is to be delivered over to interminable doubt throughout the whole process of legislation and of national operations. Congress, the executive and the judiciary, have, upon various occasions, acted upon this as a sound and reasonable doctrine." Russ v. Commonwealth, 210 Pa. 544, 60 Atl. 169, 1 L. R. A. (N. S.) 409, 105 Am. St. Rep. 825.

To the same effect was the holding of the United States Supreme Court in the case of United States v. Philbrick, 120 U. S. 52, 7 Sup. Ct. 413, 30 L. Ed. 559, where it was said:

"A contemporaneous construction by the officers upon whom was imposed the duty of executing those statutes is entitled to great weight; and since it is not clear that that construction was erroneous, it ought not now to be overturned."

But almost, if not quite, the exact question has been passed upon by the Supreme Courts of other states as applied to constitutional provisions to the same substantial effect as section 5, article 4, of our state Constitution. And in each instance the question has been decided by the Supreme Courts of other states contrary to the contention of the defendant in error, Middleton, in this case.

Under the Constitution of Pennsylvania members of the Legislature were only allowed mileage and per diem, and no more. In 1897 the dedication ceremonies of the monument to General Grant were held in the city of New York. The Legislature of Pennsylvania, by concurrent resolution, provided that they should attend such celebration in a body. This they did, at the expense of the state, which expense was covered by appropriation from the state treasury. A suit similar to this one was instituted in which it was contended that the appropriation covering their expenses was unconstitutional in that it constituted additional compensation to the members of the Legislature, in violation of the constitutional provision which, after providing for their mileage and per

diem, used the phrase "and no more." The Supreme Court of Pennsylvania overruled such contention, and held that such expenses did not constitute additional compensation, and in passing upon the question it said:

"It is conceded by the learned and able counsel for appellee that the payment of the expenses may not be technically compensation; and yet, by the process of reasoning through which they would have us declare it to be compensation, within the constitutional prohibition, the very ink furnished to Senators and members, and the pens dipped into it answering the daily inquiries of constituents, would have to be regarded as constitutionally unlawful compensation to them, if paid for by the state."

A similar question was pased upon by the Supreme Court of Nebraska, in the case of State v. Sheldon, 78 Neb. 552, 111 N. W. 372. Suit was brought to recover for rent for the use and occupation by the Governor of the mansion. The contention there, as here, was that the use and occupation of the Governor's mansion was not authorized by the Constitution which limited the Governor's salary to $2,500 per year, and that the effect of his free use of the government's property amounted to an increase in his compensation to the extent of $100 per month, the reasonable value of the rent of said premises. The Supreme Court of Nebraska held that the Governor was not liable, and that the use and occupation of the mansion was not an increase in his compensation.

The Constitution of the United States fixes the President's salary as follows:

"The President shall, at stated times, receive for his services, a compensation, which shall neither be increased nor diminished during the period for which he shall have been elected, and he shall not receive within that period any other emolument from the United States, or any of them."

Yet it is well known that Congress has each year appropriated thousands upon thousands of dollars for expenses of the President of the nature and kind here attacked, and other such expenses of a different kind taking a much wider range in the kind and quality of expenses appropriated than do the appropriations here attacked. As is well known, the Congress of the United States has at all times been composed in a large measure of great constitutional lawyers. Their action in making such appropriations covering so long a period of time amounts to a legislative construction of the federal Constitution that to allow such expenses does not increase the President's compensation or provide him with "other emolument."

It seems to me that the most that could be claimed on the question of the unconstitutionality of the appropriation bill is that its constitutionality is in doubt. That being true, the legislative construction by Congress of a similar provision in the federal Constitution, the legislative construction in Texas for more than 40 years by the Texas Legislatures, together with the Supreme Court decisions from Nebraska and Pennsylvania up-

on substantially the same question as is involved here, should be sufficient to refute the charge made in the petition by Middleton, to the effect that the appropriations here attacked were made by the Legislature in "an attempt to increase the compensation of the Governor of Texas." And since no evidence at all was introduced to prove such dishonest purpose either upon the part of the Legislature which made the appropriation, or upon the part of Governor Colquitt, who accepted its benefits, I am unable, with the lights before me, to reach the conclusion that such purpose and design in fact existed upon the part of either. Neither do I believe that any court has the right to inquire into the evil motives and purposes of the Legislature. I think the courts are restricted to the construction of the act itself, and to the language employed in it. I therefore conclude that the writ should be granted, and the case heard upon full oral argument upon submission, to the end that the doubts involved may be resolved with justice to the litigants.