**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| THE HONORABLE TOM WOLF, GOVERNOR OF THE COMMONWEALTH OF PENNSYLVANIA, | : | No. 104 MM 2020 |
| | : | |
| | : | SUBMITTED: July 1, 2020 |
| | : | |
| Petitioner | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| SENATOR JOSEPH B. SCARNATI, III, SENATOR JAKE CORMAN, AND SENATE REPUBLICAN CAUCUS, | : | |
| | : | |
| | : | |
| | : | |
| Respondents | : | |

**OPINION**

**JUSTICE WECHT**                                    **DECIDED:  July 1, 2020**

Our government's response to the challenges presented by the COVID-19 pandemic has engendered passionate arguments that span the political spectrum. Pennsylvanians have watched with great interest as the political branches of our Commonwealth's government, represented by the Governor and the General Assembly, have debated how best to respond to this novel coronavirus.  In light of the intense public interest in this issue, and because "[s]unlight is said to be the best of disinfectants,"[1] we find it necessary to make clear what this Court is, and is not, deciding in this case.  We express no opinion as to whether the Governor's response to the COVID-19 pandemic

---

[1]     LOUIS D. BRANDEIS, OTHER PEOPLE'S MONEY AND HOW THE BANKERS USE IT 92 (Frederick A. Stokes Co. ed. 1914).

constitutes wise or sound policy. Similarly, we do not opine as to whether the General Assembly, in seeking to limit or terminate the Governor's exercise of emergency authority, presents a superior approach for advancing the welfare of our Commonwealth's residents. Instead, we decide here only a narrow legal question: whether the Pennsylvania Constitution and the Emergency Services Management Code permit the General Assembly to terminate the Governor's Proclamation of Disaster Emergency by passing a concurrent resolution, without presenting that resolution to the Governor for his approval or veto.

## I. The Governor's Proclamation of Disaster Emergency

On March 6, 2020, in response to the COVID-19 pandemic, Governor Tom Wolf issued a Proclamation of Disaster Emergency ("Proclamation")[2] pursuant to 35 Pa.C.S. § 7301(c), a provision of the Emergency Management Services Code, *id.* §§ 7101, *et seq.*[3] Section 7301(c) states, in full:

> **(c) Declaration of disaster emergency.**--A disaster emergency shall be declared by executive order or proclamation of the Governor upon finding that a disaster has occurred or that the occurrence or the threat of a disaster is imminent. The state of disaster emergency shall continue until the Governor finds that the threat or danger has passed or the disaster has been dealt with to the extent that emergency conditions no longer exist and terminates the state of disaster emergency by executive order or proclamation, but no state of disaster emergency may continue for longer than 90 days unless renewed by the Governor. *The General Assembly by concurrent resolution may terminate a state of disaster emergency at any time. Thereupon, the Governor shall issue an executive order or proclamation ending the state of disaster emergency.* All executive orders or proclamations issued under this subsection shall indicate the nature of the disaster, the area or areas threatened and the conditions which have

---

[2]     Governor Tom Wolf, *Proclamation of Disaster Emergency*, COMMONWEALTH OF PENNSYLVANIA, OFFICE OF THE GOVERNOR (Mar. 6, 2020), https://www.governor.pa.gov/wp-content/uploads/2020/03/20200306-COVID19-Digital-Proclamation.pdf.

[3]     *See* Act of Nov. 26, 1978, P.L. 1332, No. 323.

brought the disaster about or which make possible termination of the state of disaster emergency. An executive order or proclamation shall be disseminated promptly by means calculated to bring its contents to the attention of the general public and, unless the circumstances attendant upon the disaster prevent or impede, shall be promptly filed with the Pennsylvania Emergency Management Agency and the Legislative Reference Bureau for publication under Part II of Title 45 (relating to publication and effectiveness of Commonwealth documents).

35 Pa.C.S. § 7301(c) (emphasis added). The Governor's Proclamation activated many emergency resources. To give just a few examples, it: transferred funds to the Pennsylvania Emergency Management Agency; suspended provisions of regulatory statutes relating to the operation of businesses, health, education, and transportation; and mobilized the Pennsylvania National Guard.

On March 19, 2020, consistent with his earlier declaration of a disaster emergency, the Governor issued an order closing businesses that were not considered life-sustaining.[4] Four Pennsylvania businesses and one individual challenged the Governor's Order, alleging that it violated the Emergency Management Services Code and various constitutional provisions. On April 13, 2020, in an exercise of our King's Bench jurisdiction, *see* 42 Pa.C.S. § 502, we ruled that the Governor's order complied with both the statute and our Constitutions. *Friends of Danny DeVito v. Wolf*, 227 A.3d 872 (Pa. 2020).

On June 3, 2020, the Governor renewed the Disaster Emergency Proclamation for an additional ninety days.[5] On June 9, 2020, the Pennsylvania Senate and the

---

[4] Governor Tom Wolf, *Order of the Governor of the Commonwealth of Pennsylvania Regarding the Closure of All Businesses That Are Not Life Sustaining*, COMMONWEALTH OF PENNSYLVANIA, OFFICE OF THE GOVERNOR (Mar. 19, 2020), https://www.governor.pa.gov/wp-content/uploads/2020/03/20200319-TWW-COVID-19-business-closure-order.pdf.

[5] Governor Tom Wolf, *Amendment to the Proclamation of Disaster Emergency*, COMMONWEALTH OF PENNSYLVANIA, OFFICE OF THE GOVERNOR (June 3, 2020), https://www.pema.pa.gov/Governor-

Pennsylvania House of Representatives adopted a concurrent resolution ordering the

Governor to terminate the disaster emergency.  The resolution provides, in relevant part:

> Whereas, pursuant to Section 12 of Article I of the Constitution of Pennsylvania, the power to suspend laws belongs to the legislature; and
>
> Whereas, 35 Pa.C.S. § 7301(c) authorizes the General Assembly by concurrent resolution to terminate a state of disaster emergency at any time; and
>
> Whereas, 35 Pa.C.S. § 7301(c) provides that upon the termination of the declaration by concurrent resolution of the General Assembly, "the Governor shall issue an executive order or proclamation ending the state of disaster emergency";
>
> Therefore be it
>
> Resolved (the Senate concurring) that the General Assembly, in accordance with 35 Pa.C.S. § 7301(c) and its Article I, Section 12 power to suspend laws, hereby terminate[s] the disaster emergency declared on March 6, 2020, as amended and renewed, in response to COVID-19; and be it further
>
> Resolved, that upon adoption of this concurrent resolution by both chambers of the General Assembly, the Secretary of the Senate shall notify the Governor of the General Assembly's action with the directive that the Governor issue an executive order or proclamation ending the state of disaster emergency in accordance with this resolution and 35 Pa.C.S. § 7301(c)[.]

H.R. Con. Res. 836, 2020 Gen. Assemb., Reg. Sess. 2019-20 (Pa. 2020) (capitalization

modified).[6]  On June 10, 2020, the Secretary of the Senate informed the Governor of the

concurrent resolution, writing:  "I am notifying you of the General Assembly's action and

---

Proclamations/Documents/06.03.2020%20TWW%20amendment%20to%20COVID%20 disaster%20emergency%20proclamation.pdf.

[6]     Although "H.R. Con. Res. 836" is the proper abbreviation for a concurrent resolution, we refer to the resolution as "H.R. 836" for brevity's sake and to accord with the parties' briefs.

the directive that you issue an executive order o[r] proclamation ending the state of disaster emergency in accordance with this resolution and 35 Pa.C.S. § 7301(c)."[7]

On June 11, 2020, Senate President Pro Tempore Joseph B. Scarnati, III, Senate Majority Leader Jake Corman, and the Senate Republican Caucus (collectively, the "Senators") filed a Petition for Review in the Nature of a Complaint in Mandamus in the Commonwealth Court, seeking to enforce H.R. 836. *See Scarnati v. Wolf*, 344 MD 2020. One day later, the Governor filed in this Court an Application for the Court to Exercise Jurisdiction Pursuant to Its King's Bench Powers and/or Powers to Grant Extraordinary Relief. On June 17, 2020, we granted King's Bench jurisdiction and stayed the Commonwealth Court proceedings. Order, 104 MM 2020, 6/17/2020.

In his Application, the Governor argues that this Court should declare H.R. 836 null and void under the Declaratory Judgments Act, 42 Pa.C.S. §§ 7531-41. We now address the merits of the Governor's Application and the Senators' Briefs.[8]

---

[7] Megan Martin, Secretary of the Senate, Letter to Governor Tom Wolf, 6/10/2020.

[8] In a letter filed June 15, 2020, the Senators stated, "In terms of the merits of the [Governor's] Application, the Senators, as noted by [the Governor], *see* Appl[ication] at 13 n.14, have already filed a substantive brief in the Commonwealth Court, *see Scarnati v. Wolf*, No. 344 MD 2020, and the Senators rely on the same to the extent the Court is looking for a response on the merits." Senators' No-Answer Letter, 104 MM, 6/15/2020, at 1. "The exercise of King's Bench authority is not limited by prescribed forms of procedure or to action upon writs of a particular nature; the Court may employ any type of process or procedure necessary for the circumstances." *In re Bruno*, 101 A.3d 635, 669 (Pa. 2014). Thus, we agreed to decide the issues raised in the Governor's Application based upon the filings submitted to this Court and to the Commonwealth Court in *Scarnati v. Wolf*, 344 MD 2020. *See* Order, 104 MM 2020, 6/17/2020. We refer to the Governor's Application, which encompasses his legal arguments, as the "Governor's Application," and we refer to the Brief of Petitioners in Support of Application of Expedited Summary Relief, which the Senators submitted to the Commonwealth Court, as the "Senators' Brief."

After granting King's Bench jurisdiction, a number of motions were filed. We take this opportunity to dispose of those motions.

## II. Presentment

This dispute concerns whether the concurrent resolution is subject to the presentment requirement embodied in the Pennsylvania Constitution. In common

---

First, we grant the Application of Representative Bryan Cutler and House Republican Caucus for Leave to Intervene as respondents. Representative Cutler and the House Republican Caucus (collectively, the "Representatives") state that their "interests . . . are aligned with the Senate respondents." *Id.* at ¶ 12. Additionally, the Representatives note that they "will adopt and join in the Petition for Review filed by the Senate respondents and the" Senators' Brief. *Id.* at ¶ 14. Thus, we deem the Representatives to have joined the Senators' brief, rather than intending to file a separate brief with this Court. *See* Pa.R.C.P. 2328(a) (requiring that, in a petition to intervene, "[t]he petitioner shall attach to the petition a copy of any pleading which the petitioner will file in the action if permitted to intervene or shall state in the petition that the petitioner adopts by reference in whole or in part certain named pleadings or parts of pleadings already filed in the action"). Additionally, as the Governor is the petitioner in this Court, the decision to allow the Representatives to intervene is not to be considered a ruling as to whether the Representatives would have standing to intervene as petitioners in the Commonwealth Court.

Second, we grant the Senators' Application for Leave to File Reply Brief. Although the Senators are the respondents in this Court, we grant the application as a supplemental brief. For convenience, we refer to this document as the "Senators' Reply Brief."

Third, we grant the various applications for leave to file briefs as *amici curiae*. *See* Application of SEIU HealthCare Pennsylvania for Leave to Participate as *Amicus Curiae*; Application for Leave to File Brief as *Amici Curiae* by Members of the Democratic Caucuses of the Pennsylvania House of Representatives and Senate of Pennsylvania; Application of the Keystone Research Center and the Pennsylvania Budget and Policy Center for Leave to Submit *Amici Curiae* Brief *Nunc Pro Tunc* in Support of Petitioner; Application for Leave to File *Amicus* Brief by the Coalition for Affordable Utility Service and Energy Efficiency in Pennsylvania, et al.; Application for Leave to File *Amicus Curiae* Brief on Behalf of the Commonwealth Foundation for Public Policy Alternatives; Application for Leave to File *Amici Curiae* Brief on Behalf of the Commonwealth Partners Chamber of Entrepreneurs, et al.

Fourth, we deny the Senators' Application for Leave to Present Oral Argument. This case involves a discrete legal issue, and there are no factual disputes. The parties, as well as *amici*, have provided ample and thoughtful briefing, and, because the subject matter of this case implicates constitutional questions concerning separation of powers as well as the effectiveness of legislative action relative to a rapidly evolving situation, it must be decided without unnecessary delay.

parlance, the question is whether H.R. 836 is subject to the Governor's veto power. Our Commonwealth's Constitution provides:

> Every order, resolution or vote, to which the concurrence of both Houses may be necessary, except on the question of adjournment, shall be presented to the Governor and before it shall take effect be approved by him, or being disapproved, shall be repassed by two-thirds of both Houses according to the rules and limitations prescribed in case of a bill.

PA. CONST. art. III, § 9. That text has remained virtually unchanged since 1790. *See* PA. CONST. of 1790, art. I, § 23, PA. CONST. of 1838, art. I, § 24, PA. CONST. of 1874, art. III, § 26. Our Constitution is clear: *all* concurrent resolutions, except in three narrow circumstances identified below, must be presented to the Governor for his approval or veto. To allow a concurrent resolution that does not fit into one of the exceptions to take effect without presentment would be to authorize a legislative veto. In *Commonwealth v. Sessoms*, 532 A.2d 775 (Pa. 1987), we adopted the reasoning of the Supreme Court of the United States in *Immigration and Naturalization Service v. Chadha*, 462 U.S. 919 (1983), and found that the provisions of Article III, Section 9 "are integral parts of the constitutional design for the separation of powers." *Sessoms*, 532 A.2d at 778 (quoting *Chadha*, 462 U.S. at 946). "[U]nder our Constitution[,] the legislative power, even when exercised by concurrent resolution, must be subject to gubernatorial review." *Id.* at 782; *see also W. Shore Sch. Dist. v. Pa. Labor Relations Bd.*, 626 A.2d 1131, 1135-36 (Pa. 1993). Because the Senators contend that H.R. 836 fits into one of the three recognized exceptions to presentment, we examine those exceptions in turn.

**A. The Exceptions to Presentment**

The first exception to presentment is obvious from the plain text of Article III, Section 9. Any concurrent resolution "on the question of adjournment" need not be presented to the Governor. No party avers that H.R. 836 involves adjournment.

The second exception to presentment is a concurrent resolution proposing a constitutional amendment. The Constitution itself, specifically Article XI, Section 1, provides the "complete and detailed process for the amendment of that document." *Kremer v. Grant*, 606 A.2d 433, 436 (Pa. 1992). We have characterized the process of amending our Constitution as "standing alone and entirely unconnected with any other subject. Nor does it contain any reference to any other provision of the constitution as being needed . . . . It is a system entirely complete in itself; requiring no extraneous aid, either in matters of detail or of general scope, to its effectual execution." *Commonwealth ex rel. Att'y Gen. v. Griest*, 46 A. 505, 506 (Pa. 1900). Because "submission to the governor is carefully excluded, . . . such submission is not only not required, but cannot be permitted." *Id.* at 507; *see also Mellow v. Pizzingrilli*, 800 A.2d 350, 359 (Pa. Cmwlth. 2002) ("Article XI has vested the power to propose amendments in the General Assembly. Other than the express requirements set forth in Article XI, the procedure to be used in proposing such amendments is exclusively committed to the legislature."). No party argues that H.R. 836 is a proposed amendment to our Commonwealth's Constitution.

The third exception to presentment is not explicitly delineated, but rather inheres in the structure of our Charter. The presentment requirement in Article III, Section 9 applies only to matters governed by constitutional provisions concerning the legislative power. *Griest*, 46 A. at 508. In other words, "it is perfectly manifest that the orders, resolutions, and votes which must be so submitted [to the Governor] are, and can only be, such as relate to and are a part of the business of legislation." *Id.* Although no provision of the Constitution explicitly withdraws non-legislative resolutions from the requirement of presentment, such resolutions involve only internal affairs of the legislature. "Under the principle of separation of the powers of government, . . . no branch should exercise the functions exclusively committed to another branch." *Sweeney v.*

*Tucker*, 375 A.2d 698, 705 (Pa. 1977). The legislature, a co-equal branch of government, has "the sole authority to determine the rules of its proceedings." *Pa. AFL-CIO ex rel. George v. Commonwealth*, 757 A.2d 917, 923 (Pa. 2000); *see also* PA. CONST. art. II, § 11 ("Each House shall have power to determine the rules of its proceedings . . . ."). Similarly, resolutions that are investigatory or ceremonial in nature, although not technically procedural, are solely within the purview of the legislature itself and need not be presented to the Governor, as such resolutions are not "a part of the business of legislation" that affects entities outside the legislative branch. *Griest*, 46 A. at 508.

As the Governor notes, "[i]n *Russ v. Commonwealth*, 60 A. 169 (Pa. 1905), this Court explained the difference between resolutions that solely involve internal matters within the General Assembly and those that reach beyond the walls of its two chambers." Governor's Application at 17. In *Russ*, the General Assembly passed a resolution that allowed members of the Senate and the House of Representatives to attend a ceremony dedicating a monument to President Ulysses S. Grant and provided for expenses associated with the ceremony. In distinguishing between resolutions that involved only the internal affairs of the General Assembly and those with legal effect that require presentment, we wrote:

> If both houses had simply resolved to attend the exercises in a body, and to adjourn for a day for that purpose, it would have been no concern of the Governor, and they could have gone with or without his approval; but, if more was embodied in the resolution, amounting practically to an enactment authorizing special committees of the Senate and House to act on behalf of the state in making suitable the recognition which both branches of the Legislature had agreed upon, it was for the Governor to approve or disapprove.

*Russ*, 60 A. at 171. Thus, when the legislature seeks to "act on behalf of the state" by way of a concurrent resolution, that resolution must be presented to the Governor. *Id.*

Summarizing *Russ* and *Griest* in 1915, Attorney General Francis Brown opined:

> [N]ot all joint or concurrent resolutions passed by the legislature must be submitted to the Governor for his approval, but only such as make legislation or have the effect of legislating, *i.e.*, enacting, repealing or amending laws or statutes or which have the effect of committing the State to a certain action or which provide for the expenditure of public money. Resolutions which are passed for any other purpose, such as the appointment of a committee by the legislature to obtain information on legislative matters for its future use or to investigate conditions in order to assist in future legislation, are not required to be presented to the Governor for action thereupon.

*Joint or Concurrent Resolutions*, 24 Pa. D. 721, 723 (Pa. Att'y Gen. 1915); *see also Concurrent Resolutions*, 7 Pa. D. & C. (Pa. Att'y Gen. 1926) (embracing Attorney General Brown's opinion).  We find that Attorney General Brown's formulation accurately relates the requirements of our Constitution and precedent.  Specifically, we agree that whether a concurrent resolution requires presentment depends upon whether the resolution comprises legislation or has the effect of legislating.

Attorney General Brown correctly discerned that, when a court has to determine whether a concurrent resolution is an act of legislating, the court must look to the substance of that resolution, rather than adhering to a formulaic approach that confines the court to the title or label of the resolution.  As the Governor's *amici* note, when the federal Constitutional Convention added a provision to the federal Constitution analogous to Article III, Section 9, *see* U.S. CONST. art. I, § 7, cl. 3, James Madison told the Convention that, "if the negative of the President was confined to bills, it would be evaded by acts under the form and name of resolutions, votes, [etc.]."[9]  The next day, Edmund Randolph moved to insert what is now Article I, Section 7, Clause 3 into the draft of the federal Constitution for the purpose of "putting votes, resolutions, [etc.], on a footing with

---

[9] Brief of *Amici Curiae*, Members of the Democratic Caucuses of the Pennsylvania House of Representatives and the Senate of Pennsylvania, at 12 (quoting Statement of James Madison (Aug. 15, 1787), *in* 5 THE DEBATES IN THE SEVERAL STATE CONVENTIONS OF THE ADOPTION OF THE FEDERAL CONSTITUTION 431 (Jonathan Elliot, ed., 1827)).

bills." The Convention adopted the proposal.[10] That Pennsylvania's 1790 Convention occurred just after the adoption of the federal Constitution, and that the language in the two Constitutions is nearly identical lends support to the proposition that the substance of the resolution, rather the formal title or procedure used for passage, should govern whether the resolution has "the effect of legislating" and therefore must be presented to the Governor.

The Senators do not dispute that resolutions with legal effect should be subject to presentment. *See* Senators' Brief at 23 ("In the practice of the Pennsylvania Legislature, bills and joint resolutions intended to have the effect of laws have been transmitted to the Governor for his approval.") (quoting CHARLES B. BUCKALEW, AN EXAMINATION OF THE CONSTITUTION OF PENNSYLVANIA 94 (1883)). Rather, the Senators contend that neither the Governor's Proclamation nor H.R. 836 had legal effect, and, thus, H.R. 836 should not be subject to presentment.

Looking first to the Governor's Proclamation, it is obvious that this order had legal effect. The Proclamation transferred funds, suspended certain statutory and regulatory provisions, and activated the Pennsylvania National Guard. *See* Governor's Application at 26-27 (listing actions taken by various state agencies pursuant to the Proclamation). As we stated in *Friends of Danny DeVito*, "[t]he Emergency Code specifically recognizes that under its auspices, the Governor has the authority to issue executive orders and proclamations which shall have the full force of law." *Friends of Danny DeVito*, 227 A.3d at 892. The Proclamation had "the full force of law." *Id.*

The Senators claim that the Proclamation was merely "a declaration of fact" and "did not (and could not) prescribe the rules of civil conduct and, instead, established the

---

[10] *See* Statement of Edmund Randolph (Aug. 16, 1787), *in* 5 THE DEBATES IN THE SEVERAL STATE CONVENTIONS OF THE ADOPTION OF THE FEDERAL CONSTITUTION 431-32 (Jonathan Elliot, ed., 1827).

factual predicate necessary for other executive agencies to use certain powers granted to them by statute." Senators' Brief at 27; *see also id.* at 28 ("[E]mergency proclamations [a]re not laws, but rather formal announcements that create[] the circumstances necessary for the exercise of certain statutory powers."). Setting aside the Proclamation's direct legal effects, to distinguish between the Governor authorizing other agencies to act and those other agencies taking actions pursuant to the Proclamation would be to elevate form over substance. But for the Proclamation authorizing other agencies to act, those other agencies could not have issued orders with the force of law, such as requiring the closure of certain businesses. If nothing else, the legal effect of the Proclamation was to allow the Governor to exercise powers granted to him by the General Assembly upon the declaration of a disaster emergency.

Turning to H.R. 836, the Senators argue that this resolution "does not provide for expenditure of public funds and does not commit the state to an affirmative act." *Id.* at 30. With regard to the expenditure of public funds, we have ruled that a concurrent resolution which spends public money requires presentment. For example, in *Russ*, we decided that, had the General Assembly simply adjourned to attend the ceremony in question, the resolution would not have required presentment. Yet, when the legislature committed public money to the ceremony, the Governor's approval (or a vote overriding a veto) became necessary. *Russ*, 60 A. at 171. Similarly, in *Scudder v. Smith*, 200 A. 601 (Pa. 1938), we determined that a joint resolution required presentment because the resolution both created a commission and appropriated $5,000 for that commission. *Id.* at 602-04. But while the expenditure of funds is a sufficient condition for requiring presentment, it is not a necessary one. *See Joint or Concurrent Resolutions*, 24 Pa. D. at 721 (opining that resolutions "which have the effect of committing the State to a certain action *or* which provide for the expenditure of public money" require presentment)

(emphasis added). The General Assembly can pass a bill or resolution that has legal effect even if the bill or resolution does not commit the Commonwealth to spending any money. Each time the General Assembly adds a new crime to our Criminal Code, certain conduct becomes illegal. One could not argue that the General Assembly could amend the Criminal Code through a bill or concurrent resolution without presentment simply because that bill or resolution did not appropriate funds. *Cf. Commonwealth v. Kuphal*, 500 A.2d 1205, 1216-17 (Pa. Super. 1985) (Spaeth, P.J., dissenting) (declaring that "[t]he conclusion is therefore inescapable that" a concurrent resolution that rejected sentencing guidelines was an "exercise of legislative power" that required presentment).

Effectively acknowledging a non-expenditure-based category of legislative resolution, the Senators aver that, because H.R. 836 "does not authorize any action on behalf of the state," Senators' Brief at 31, the resolution was not a legislative action. Although in *Russ* we noted that a resolution authorizing the General Assembly "to act on behalf of the state" would require presentment, *Russ*, 60 A.at 171,[11] the purported distinction between requiring the government affirmatively to act and prohibiting the government from taking an action is no distinction at all.

In *West Shore*, we considered whether the General Assembly could use a concurrent resolution, without presentment, to reestablish the Pennsylvania Labor Relations Board ("PLRB") after the agency was slated to be disbanded. We ruled that "[m]erely the passage of a resolution by both chambers . . . reestablish[ing] an agency set for termination . . . violates Article 3, Section 9 of our State Constitution." *West Shore*, 626 A.2d at 1136. By way of further example, imagine that an executive branch agency promulgates a new regulation that requires all businesses to purchase a fire extinguisher.

---

[11]   *Cf. Joint or Concurrent Resolutions*, 24 Pa. D. at 723 (writing that a concurrent resolution "which ha[s] the effect of committing the State to a certain action" would require presentment).

The General Assembly, disagreeing with this regulation, passes a concurrent resolution overturning the regulation. That concurrent resolution does not require the executive branch to take any affirmative steps. To the contrary, the resolution forbids the executive branch from acting to enforce the regulation. But one could not characterize the General Assembly's resolution, in this scenario, as intending no legal effect and thereby functioning differently than any other prohibitory legislation. Just as a business's legal obligations would be affected by promulgation of the regulation, those same legal obligations would be affected by its repeal.[12]

H.R. 836 acts in the same manner as the resolutions in *West Shore* and the above hypothetical. Even if the Senators are correct that H.R. 836 does not require any affirmative act on behalf of the Governor, the same was true in *West Shore*. There, the concurrent resolution did not require the executive branch to act; it simply mandated that the executive branch not allow the PLRB to terminate. Prohibiting the termination of the PLRB had legal effect, just as prohibiting an agency from enforcing a regulation would have legal effect.

Related to the Senators' argument, the Dissenting Opinion ("Dissent") asserts that Section 7301(c)'s language regarding a concurrent resolution "does not bear on the

---

[12] The Senators also cite *Fabrizio v. Kopriver*, 73 Dauph. 345 (Dauphin Cty. C.C.P. 1959). *See* Senators' Brief, Exhibit 2. In that case, the court of common pleas stated that, "if the resolution . . . does not commit the State to any affirmative action, then such a resolution should not be within the purview of" Article III, Section 9. *Fabrizio*, 73 Dauph. at 348. The *Fabrizio* Court was comparing a concurrent resolution setting up a legislative investigating committee, but appropriating no funds, to the resolution in *Scudder*, where the resolution both set up a committee and appropriated funds. *Id.* at 348-49. Thus, while the action in *Scudder* involved the appropriation of funds, an affirmative act, it does not appear that the court of common pleas considered a scenario involving a resolution that forbid the executive branch from enforcing legal obligations. In any event, the decision of a court of common pleas, even if that particular court was the predecessor to the Commonwealth Court, *see* Senators' Brief at 25 n. 15, is not binding upon this Court and does not carry with it the weight of *stare decisis*.

essential relationship to conventional legislation." Dissent at 3. As noted above, the inclusion of Article III, Section 9 in our Constitution is not simply to require presentment for "conventional legislation," but rather to require presentment for all bills, "resolutions, votes, [etc.]," Statement of James Madison (Aug. 15, 1787), *supra*, that have the *effect* of legislating. Any resolution passed by the General Assembly pursuant to Section 7301(c), including H.R. 836, has the effect of legislating. The resolution intends to prevent the Governor from carrying out powers delegated to him under the Emergency Services Management Code, powers which are enforceable with "the force and effect of law." 35 Pa.C.S. § 7301(b); *see also Friends of Danny DeVito*, 227 A.3d at 872.

As *amici* observe, H.R. 836 "would drastically alter the enforcement and suspension of certain state laws and regulations, economic activity across a wide variety of sectors, medical and healthcare practices, public health operations, National Guard deployment and other aspects of everyday life for millions of Pennsylvanians."[13] Enforcement of H.R. 836, which requires the Governor to end the state of disaster emergency, would have far-reaching legal consequences beyond the Governor simply signing and publishing a new proclamation. It would prohibit the Governor from taking legal actions, and that prohibition itself has legal effect. To distinguish between a resolution that requires the Governor to take affirmative action and a resolution that forbids him from enforcing the law would be to elevate form over substance and allow "the negative of the" Governor to be "evaded by acts under the form of resolutions," Statement of James Madison (Aug. 15, 1787), *supra*. Article III, Section 9 protects against such a result. Thus, H.R. 836 does not fit into the third exception to presentment.

---

[13] Brief of *Amici Curiae*, Members of the Democratic Caucuses of the Pennsylvania House of Representatives and the Senate of Pennsylvania, at 9-10; *see also* Governor's Application at 22 (describing the same).

The Dissent offers a novel view of both the text of our Constitution and our precedent regarding the constitutionality of the legislative veto. The Dissent posits that this Court should use a functionalist approach in determining whether a legislative veto passes constitutional muster. *See* Dissent at 5-6 ("I believe that the present context presents a compelling case that legislative vetoes should not be regarded as being *per se* violative of separation-of-powers principles."). Relative to this case, the Dissent suggests that "the breadth of the essential delegation of emergency powers to the executive in light of future and unforeseen circumstances justifies an equally extraordinary veto power in the Legislature." *Id.* at 3-4 n.2 (citing *Commc'n Workers of Am., AFL-CIO v. Florio*, 617 A.2d 223 (N.J. 1992)); *cf. id.* at 4 ("In this respect, it is my considered judgment that the emergency-powers paradigm is essentially *sui generis*.").

To support its proposed exception to the requirement of presentment, the Dissent offers two points. First, the Dissent does "not regard [*Sessoms*] as binding precedent in the present -- and very different -- context." *Id.* at 5; *cf. id.* at 4-5 n.3 (calling *Sessoms* "incompletely reasoned" because it "failed to recognize the exception to presentment requirement, deriving from the *Griest* decision, for matters that do not concern the business of legislating"). While we evaluated a different statute in *Sessoms*, our opinion there was clear: "[E]xcept as it relates to the power of each House to determine its own rules of proceedings, under our Constitution the legislative power, even when exercised by concurrent resolution, must be subject to gubernatorial review." *Sessoms*, 532 A.2d at 782. *Sessoms* repeatedly noted our adoption of the approach of the Supreme Court of the United States. *See id.* at 779-80 ("[O]nce [the legislature] makes its choice enacting legislation, its participation ends. [It] can thereafter control the execution of its enactment only indirectly—by passing new legislation.") (quoting *Bowsher v. Synar*, 478 U.S. 714, 733-34 (1986)) (emphasis omitted); *id.* at 780 (relying upon the reasoning of the *Chadha*

Court that "the legislative branch" cannot "directly or indirectly . . . retain some power over the execution of the laws"). We reiterated this interpretation of Article III, Section 9 in *West Shore*, *see West Shore*, 626 A.2d at 1135-36, and our lower courts also have reasoned that *Sessoms* provides no exception to presentment, other than those discussed above. *See, e.g.*, *MCT Transp. Inc. v. Phila. Parking Auth.*, 60 A.3d 899, 915 n.17 (Pa. Cmwlth. 2013)[14] ("In short, the General Assembly cannot exercise a legislative veto over an administrative agency's budget. The power of the veto belongs only to the executive."); *Dep't of Envtl. Res. v. Jubelirer*, 567 A.2d 741, 749 (Pa. Cmwlth. 1989)[15] ("Nothing less than legislation may suffice to override the rule-making power of the [Environmental Quality Board] or any other executive agency."). That *Sessoms* did not discuss the *Griest* exception to presentment hardly renders *Sessoms* "incompletely reasoned," Dissent at 5 n.3, especially inasmuch as we endorsed the same exception in *West Shore*, *see West Shore*, 626 A.2d at 1135 (noting that the resolution in question "had the effect of law"). The Dissent stands alone in deriving an exception to presentment from the type of legislation at issue.

Related to this first point, the Dissent cites only decisions from the New Jersey Supreme Court and Justice Powell's concurrence in *Chadha*. *See* Dissent at 4-6, 9. The New Jersey Supreme Court, of course, has free reign to interpret that state's Constitution, but New Jersey's approach, in *Florio* and *Enorato v. New Jersey Building Authority*, 448 A.2d 449 (N.J. 1982), not only does not bind this Court; it also contradicts our approach to the legislative veto prescribed by our Constitution's presentment clause (Article III,

---

[14]     We issued two *per curiam* orders affirming the Commonwealth Court's decision. *See MCT Transp. Inc. v. Phila. Parking Auth.*, 81 A.3d 813 (Pa. 2013) (*per curiam*); *MCT Transp. Inc. v. Phila. Parking Auth.*, 83 A.3d 85 (Pa. 2013) (*per curiam*)

[15]     We vacated the decision of the Commonwealth Court on other grounds. *Dep't of Envtl. Res. v. Jubelirer*, 614 A.2d 204 (Pa. 1992).

Section 9) and our precedent in *Sessoms* and *West Shore*. And while Justice Powell's concurrence in *Chadha* also endorses a functionalist model for interpreting a presentment clause, the majority in *Chadha*, which this Court relied upon in *Sessoms*, rejected that model. *See Chadha*, 462 U.S. at 946 ("The records of the Constitutional Convention reveal that the requirement that *all* legislation be presented to the President before becoming law was uniformly accepted by the Framers.") (emphasis added).

In sum, "[t]here is no support in the Constitution or decisions of this Court for the proposition that the cumbersomeness and delays often encountered in complying with explicit Constitutional standards may be avoided" by characterizing the legislation as a delegation of emergency powers. *Id.* at 959. A legislative veto in the context of a statute delegating emergency powers might be a good idea. It might be a bad idea. But it is not a *constitutional* idea under our current Charter.

**B. Section 7301(c) Requires Presentment**

Our conclusion that a concurrent resolution seeking to force the Governor to end a state of disaster emergency has legal effect and does not fit into any of the three recognized exceptions to presentment bears upon our interpretation of Section 7301(c) itself. The concurrent resolution provision of Section 7301(c) provides: "The General Assembly by concurrent resolution may terminate a state of disaster emergency at any time. Thereupon, the Governor shall issue an executive order or proclamation ending the state of disaster emergency." 35 Pa.C.S. § 7301(c). "[T]he best indication of legislative intent is the plain text of the statute." *Whalen v. Pa., Dep't of Transp., Bureau of Driver Licensing*, 32 A.3d 677, 679 (Pa. 2011). Thus, we evaluate whether the plain text of Section 7301(c) expresses the General Assembly's intent that presentment not be a part of the concurrent resolution process in that provision.

The Senators, *see* Senators' Reply Brief at 8-12, and their *amicus*[16] aver that Section 7301(c) cannot be read to require presentment. Though providing little textual analysis, the Senators point to the words "at any time," "[t]hereupon," and "shall issue" to suggest that the General Assembly did not intend to require presentment for a concurrent resolution under the statute. *See* Senators' Reply Brief at 8. According to *amicus*, "[t]he General Assembly purposely declined to include a veto mechanism in [S]ection 7301(c) and thereby made manifest its intent to require ministerial gubernatorial action whenever a concurrent resolution ends a state of disaster emergency."[17] We acknowledge that the Senators' reading of Section 7301(c) is a reasonable one. In particular, the word "[t]hereupon" could imply that the Governor must issue an executive order as soon as the General Assembly passes the concurrent resolution, without the Governor having an opportunity to approve or veto the resolution first. *See Thereupon*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("Immediately; without delay; promptly.").

However, the Senators' interpretation of Section 7301(c) is not the only reasonable reading of the statute. Section 7301(c) does not state unequivocally that the Governor's declaration of a disaster emergency is terminated the moment that the General Assembly passes a concurrent resolution purporting to do so. If the General Assembly intended to give itself the ability to terminate a state of disaster emergency unilaterally, there would have been no need to involve the Governor in the equation at all. If this had been the intent of the General Assembly, the language of Section 7301(c) would have been considerably more straightforward and truncated, *i.e.,* "the state of disaster emergency will be terminated by passage of a concurrent resolution so stating." Instead, the General

---

[16]     *See* Brief of *Amicus Curiae*, the Commonwealth Foundation for Public Policy Alternatives, in Support of Respondents, at 12-15.

[17]     Brief of *Amicus Curiae*, the Commonwealth Foundation for Public Policy Alternatives, in Support of Respondents, at 15.

Assembly chose to require an extra step: the Governor must terminate the declaration of disaster emergency. The requirement in Section 7301(c) that the Governor must act to end the disaster emergency is a sign that the General Assembly understood that its concurrent resolution would be presented to the Governor, in conformity and compliance with Article III, Section 9.[18]

The Concurring and Dissenting Opinion ("CDO") disagrees. Specifically, the CDO suggests that inclusion of a role for the Governor is "easily explained: the legislature wields no executive power in this limited context and has no means to retract the chief executive's previously-issued proclamation, or to issue a new declaration or proclamation undoing the previous one." CDO at 3. But that conclusion is beside the point. The General Assembly is well-aware that the power to declare or end a disaster emergency is not an exclusively "executive power."

As we explained in *Friends of Danny DeVito*, "[t]he broad powers granted to the Governor in the Emergency [Services Management] Code are firmly grounded in the Commonwealth's police power." *Friends of Danny DeVito*, 227 A.3d at 886. The Commonwealth's police power is not exercised by the Governor alone, but rather "is the inherent power of a body politic to enact and enforce laws for the promotion of the general welfare." *Commonwealth v. Barnes & Tucker Co.*, 371 A.2d 461, 465 (Pa. 1977). The General Assembly, not just the Governor, can exercise the police power. *See Nat'l Wood*

---

[18] This interpretation of Section 7301(c) accords with the procedures set forth in the Legislative Procedures Manual, which mirrors Article III, Section 9:

> Every order, resolution or vote, to which the concurrence of both houses is necessary, except on the question of adjournment and except joint resolutions proposing or ratifying constitutional amendments, is presented to the Governor and before it takes effect is approved by him or, being disapproved, may be repassed by two-thirds of both houses according to the rules and limitations prescribed in case of a bill.

101 PA. CODE § 9.245.

*Preservers, Inc. v. Dep't of Envtl. Res.*, 414 A.2d 37, 39 (Pa. 1980) (adjudicating a dispute about whether a statue was "a constitutional exercise of the Legislature's police power"). Indeed, the General Assembly's very delegation of power to the Governor presupposed the General Assembly's inherent authority both to declare and to end disaster emergencies under its lawmaking powers. *See* PA. CONST. art. II, § 1 ("The legislative power . . . shall be vested in a General Assembly . . . ."). The General Assembly has the power to terminate a declaration of disaster emergency without any action by the Governor, aside from presentment and an overriding vote in the event of a veto. If the legislature wishes to end a disaster emergency and satisfies presentment, followed either by gubernatorial approval or by veto override, then further action by the Governor would in any event be unnecessary. The Governor would simply be bound to follow the law.[19] If a statute or resolution is passed over the Governor's veto, the Governor still must abide by that law, even if the General Assembly does not specifically require that the Governor enforce that law. *See* PA. CONST. art. IV, § 2 ("The supreme executive power shall be vested in the Governor, who shall take care that the laws be faithfully executed . . . ."). That the General Assembly decided to give the Governor a role in ending the emergency disaster declaration in Section 7301(c) is strong evidence that the General Assembly intended to abide by the Constitution, which also requires gubernatorial involvement.

"Under the canon of constitutional avoidance, if a statute is susceptible of two reasonable constructions, one of which would raise constitutional difficulties and the other of which would not, we adopt the latter construction." *Commonwealth v. Herman*, 161

---

[19] The CDO asserts: "It would have been impossible for the legislature to have written this statute in a way that omits any mention of the Governor whatsoever while simultaneously requiring some physical, executive action on his part." CDO at 3. We disagree. The General Assembly could have written the statute to provide for the termination of a state of disaster emergency without the Governor issuing a subsequent executive order or proclamation. Enactment of such a resolution, through the process of presentment, could end the state of disaster emergency immediately.

A.3d 194, 212 (Pa. 2017). This canon of statutory interpretation is prescribed both by our General Assembly and by our precedent. The legislative branch has advised this Court that, "[i]n ascertaining the intention of the General Assembly in the enactment of a statute," we are to presume that the legislature "does not intend to violate the Constitution . . . of this Commonwealth." 1 Pa.C.S. § 1922(3). Duly incorporating this codified presumption into our case law, we repeatedly have emphasized that, if a statute is susceptible of two reasonable interpretations, we will interpret the statute in such a manner so as to avoid a finding of unconstitutionality. *See, e.g.*, *Commonwealth v. Veon*, 150 A.3d 435, 443 (Pa. 2016); *MCI WorldCom, Inc. v. Pa. Pub. Util. Comm'n*, 844 A.2d 1239, 1249 (Pa. 2004); *Commonwealth v. Bavusa*, 832 A.2d 1042, 1050 (Pa. 2003).[20]

Applying the canon of constitutional avoidance, Section 7301(c) must be read to require presentment to the Governor. As discussed above, any resolution seeking to end a declaration of disaster emergency has the effect of legislating, necessitating presentment. Thus, although the Senators' interpretation of Section 7301(c) is reasonable, that interpretation would violate our Commonwealth's Constitution. Because there is another reasonable interpretation of Section 7301(c)—that the provision does require presentment—we must read the statute in that manner. Therefore, because H.R. 836 was not presented to the Governor and, in fact, affirmatively denied the Governor the

---

[20] We note that, "[a]lthough courts should interpret statutes so as to avoid constitutional questions when possible, they cannot ignore the plain meaning of a statute to do so." *Robinson Twp. v. Commonwealth*, 147 A.3d 536, 574 (Pa. 2016). Courts cannot disregard the General Assembly's intent, as evinced by the plain text of the statute, and rewrite that statute in order to avoid a constitutional question. In this instance, our close examination reveals that the statutory provision in question is susceptible to two reasonable interpretations.

opportunity to approve or veto that resolution,[21] H.R. 836 did not conform with the General Assembly's statutory mandate in Section 7301(c) or with the Pennsylvania Constitution.

The Dissent contends that application of the canon of constitutional avoidance should depend upon whether "the chosen construction substantially weakens the Legislature's ability to act as a check on the actions of a co-equal branch." Dissent at 8 n.5. There is no basis in our jurisprudence to authorize creation of a sliding scale of constitutional avoidance based upon whether the provision at issue involves one branch's ability to control the affairs of another branch. The General Assembly has prescribed for this Court one standard for deciding constitutional avoidance questions: a presumption "[t]hat the General Assembly does not intend to violate the Constitution . . . of this Commonwealth." 1 Pa.C.S. § 1922(3). We apply that standard today.

Both the Governor and the Senators point to precedent from this Court where we have, and have not, applied the canon of constitutional avoidance in interpreting a statutory provision that did not explicitly require presentment of a concurrent resolution. For example, in *Sessoms*, we concluded that the General Assembly intended to require presentment in a statute providing that the General Assembly could reject sentencing guidelines adopted by the Pennsylvania Commission on Sentencing. *Sessoms*, 532 A.2d at 782; *see also* Governor's Application at 19. Conversely, in *West Shore*, we determined that we could not interpret a provision of the Sunset Act, Act of December 22, 1981, P.L. 508 No. 142, to require presentment. *West Shore*, 626 A.2d at 1135-36; *see also* Senators' Reply Brief at 10-12. That we reached differing conclusions in these two cases

_____

[21] *See* H.R. 836 (requiring the Secretary of the Senate to "notify the Governor of the General Assembly's action with the directive that the Governor issue an executive order or proclamation ending the state of disaster emergency"); *see also* Megan Martin, Secretary of the Senate, Letter to Governor Tom Wolf, 6/10/2020 ("I am notifying you of the General Assembly's action and the directive that you issue an executive order o[r] proclamation ending the state of disaster emergency in accordance with this resolution and 35 Pa.C.S. § 7301(c).").

on the question of constitutional avoidance confirms what every legal practitioner knows to be true: every case, and every statute, must be evaluated independently. Evaluating Section 7301(c), we find that there are two reasonable interpretations, and, thus, we must apply our canon of constitutional avoidance as we weigh them.

Indeed, the case for constitutional avoidance in this case is stronger than in *Sessoms*. The statute at issue in *Sessoms* provided that "[t]he General Assembly may by concurrent resolution reject in their entirety any initial or subsequent guidelines adopted by the [Pennsylvania Commission on Sentencing] within 90 days of their publication in the Pennsylvania Bulletin." *Sessoms*, 532 A.2d at 776-77 (quoting the version of 42 Pa.C.S. § 2155(b) then in effect[22]). We interpreted Section 2155(b) to require presentment even though that provision did not mention the Governor. By contrast, the language of Section 7301(c) presents a stronger basis for reading the presentment requirement into the provision because the General Assembly explicitly provided for gubernatorial involvement.

In *Sessoms*, "we d[id] not find it fatal to" Section 2155(b) "that it d[id] not explicitly require presentment of a rejection resolution to the [G]overnor," as we could "imply such a condition to avoid finding the statute unconstitutional on its face." *Id.* at 782. Although *Sessoms* is helpful in terms of evaluating Section 7301(c), our language there expressed a truism: if a statute is ambiguous, a court should interpret that statute in such a manner

---

[22] Section 2155(b) has since been amended by the General Assembly to read:

**(b) Rejection by General Assembly.--***Subject to gubernatorial review pursuant to section 9 of Article III of the Constitution of Pennsylvania*, the General Assembly may by concurrent resolution reject in their entirety any guidelines, risk assessment instrument or recommitment ranges adopted by the commission within 90 days of their publication in the Pennsylvania Bulletin pursuant to subsection (a)(2).

42 Pa.C.S. § 2155(b) (emphasis added).

as to avoid a finding of unconstitutionality. The *Sessoms* truism applied the canon of constitutional avoidance in the context of Article III, Section 9. We do so again today.

While the canon of constitutional avoidance leads us to the interpretation we adopt here, a reading of Section 7301(c) in its entirety further militates in favor of presentment. In the clearest language possible, the statute authorizes the Governor to declare that a disaster emergency has occurred or is imminent, to continue the state of disaster emergency until such time as the Governor finds that the threat or danger has passed, and, to the extent the threat has passed or an emergency no longer exists, to terminate the state of disaster emergency by executive order or proclamation.[23] Thus, while Section 7301(c) provides that the General Assembly may terminate a state of disaster emergency at any time, the statute also provides that the state of disaster emergency ends only after the Governor so finds. By reading the presentment requirement into Section 7301(c), we afford meaning to all of the provisions of the statute. If the Governor does not agree with the General Assembly that the emergency has ended, the Governor can exercise a veto, a veto that, with any other legislation, can be overridden by a two-thirds vote of both Houses of the General Assembly.

---

[23] The Governor's role in declaring and ending a state of disaster emergency is clear:

> A disaster emergency shall be declared by executive order or proclamation *of the Governor* upon finding that a disaster has occurred or that the occurrence or the threat of a disaster is imminent. The state of disaster emergency shall continue *until the Governor* finds that the threat or danger has passed or the disaster has been dealt with to the extent that emergency conditions no longer exist and terminates the state of disaster emergency by executive order or proclamation, but no state of disaster emergency may continue for longer than 90 days unless renewed *by the Governor*. The General Assembly by concurrent resolution may terminate a state of disaster emergency at any time. Thereupon, *the Governor shall* issue an executive order or proclamation ending the state of disaster emergency.

35 Pa.C.S. § 7301(c) (emphases added).

Based upon the plain text of the statute and upon our canon counseling against invalidation of statutes on constitutional grounds where possible, we hold that Section 7301(c)'s provision allowing the General Assembly to terminate a state of disaster emergency by concurrent resolution requires presentment of that resolution to the Governor. Because the General Assembly did not present H.R. 836 to the Governor for his approval or veto, the General Assembly did not comply with its own statutory directive in Section 7301(c).

The Senators observe that, in *Friends of Danny DeVito*, regarding the concurrent resolution provision of Section 7301(c), we stated: "As a counterbalance to the exercise of the broad powers granted to the Governor, the Emergency Code provides that the General Assembly by concurrent resolution may terminate a state of disaster emergency at any time." *Friends of Danny DeVito*, 227 A.3d at 886; *see also id.* at 896 ("We note that the Emergency Code temporarily limits the Executive Order to ninety days unless renewed and provides the General Assembly with the ability to terminate the order at any time."). Nowhere in *Friends of Danny DeVito* did we state that the Emergency Services Management Code allows the General Assembly to terminate a state of disaster emergency by way of concurrent resolution without presentment. No party in *Friends of Danny DeVito* presented to this Court the questions of interpretation of the concurrent resolution provision or the constitutional demands of presentment. Nonetheless, that language accords with our decision today. Section 7301(c) does indeed contain a "counterbalance to the exercise of the broad powers granted to the Governor." *Id.* at 886. Confronted now with the duty to interpret Section 7301(c) and Article III, Section 9, and informed by the advocacy of the parties and *amici*, we conclude that the legislative

counterbalance complies with the presentment requirement of our Commonwealth's Constitution.[24]

### III. The Power to Suspend Laws

As an alternative argument, the Senators posit that the General Assembly could end the state of disaster emergency through a concurrent resolution without presentment under Article I, Section 12 of the Pennsylvania Constitution. *See* Senators' Brief at 31-45. That clause of our Constitution provides: "No power of suspending laws shall be exercised unless by the Legislature or by its authority." PA. CONST. art. I, § 12. The Senators appear to make two distinct arguments with regard to Article I, Section 12. First, they maintain that the provision gives the legislature the right to suspend laws unilaterally, essentially asking that this Court recognize a new exception to presentment. *See* Senators' Brief at 31-40. Second, the Senators contend that the Governor's powers under Section 7301(c) were a delegation of this suspension power and that this Court should permit the General Assembly to revoke its authority without presentment. *See id.* at 40-45.

### A. Article I, Section 12 Does Not Give the Legislature the Power to Act Unilaterally

The history of Article I, Section 12 indicates that the clause was intended as a negative check on executive power, rather than an affirmative grant of power to the legislature to act unilaterally. English monarchs had long asserted a royal prerogative to suspend laws. "The suspending power was much more powerful than the veto because it allowed a king to nullify not only bills that were presented for his assent but also all statutes that pre-dated his reign—indeed, every law on the statute books." Robert J. Reinstein, *The Limits of Executive Power*, 59 AM. U. L. REV. 259, 278-79 (2009). After

---

[24] Having decided that Section 7301(c) is not facially unconstitutional, we need not reach the issue of whether any provision must be severed from the statute. *Cf.* CDO at 5-10; Senators' Reply Brief at 12-17.

the Glorious Revolution of 1688, the English Parliament sought to limit the power of the monarch, specifically with regard to the suspension of laws. Thus, the 1689 "English Bill of Rights expressly barred the Crown from suspending the laws or issuing dispensations that permitted individuals to ignore certain laws." Saikrishna Bangalore Prakash, *The Imbecilic Executive*, 99 VA. L. REV. 1361, 1365 (2013). The 1689 English Bill of Rights specifically faulted "the late King James the Second . . . [for] suspending of laws and the execution of laws without consent of Parliament." 1 Wm. & Mary, ch. 2 in 3 Eng. Stat. at Large 441 (1689). Accordingly, that document declared "[t]hat the pretended power of suspending the laws or the execution of laws by regal authority without consent of Parliament is illegal." *Id.* § 1.

As states began enacting constitutions after our Nation declared independence, the Framers of those Constitutions, still wary of executive power, adopted provisions similar to that in the 1689 English Bill of Rights. *See* Steven G. Calabresi, Sarah E. Agudo & Kathryn L. Dore, *State Bills of Rights in 1787 and 1791: What Individual Rights Are Really Deeply Rooted in American History and Tradition?*, 85 S. CAL. L. REV. 1451, 1534-35 (2012) (listing early state constitutions with similar clauses). For example, the Framers of early Virginia Constitutions "held [a] historic distrust [of concentrated executive power] based on the 'arbitrary practice' of English Kings before the Glorious Revolution of 1688," and endorsed a provision preventing the executive from suspending laws unilaterally. *Hewell v. McAuliffe*, 788 S.E.2d 706, 721 (Va. 2016). The Kentucky Supreme Court, noting that the clause in the Kentucky Constitution "was modeled after a similar provision in the Pennsylvania Constitution," stated that the clause "was originally designed to reflect the will of the framers to prevent suspension of duly-enacted laws by any entity other than the constitutionally-elected legislative body, a power the British government had ruthlessly exercised over the colonies." *Baker v. Fletcher*, 204 S.W.3d 589, 592 (Ky.

2006). Thus, Article I, Section 12, like the clauses in other early state constitutions, traces its roots to the 1689 English Bill of Rights. *See Nicolette v. Caruso*, 315 F. Supp. 2d 710, 726 (W.D. Pa. 2003).

The 1689 English Bill of Rights indicates that the analogous provision was aimed at preventing English monarchs from suspending laws on their own initiative and was not intended to transfer to Parliament the power to act unilaterally. Indeed, the text of the 1689 provision confirms this reading. After promulgation of the 1689 English Bill of Rights, the monarch could not suspend laws "without the *consent* of Parliament." 1 Wm. & Mary, ch. 2, § 1 (emphasis added). It appears that, rather than shifting the power to suspend laws from one branch to another, the purpose of the provision was to ensure a shared power between King or Queen and Parliament, a form of what we commonly refer to as checks and balances.[25] Imputing this historical understanding to our own Constitution, Article I, Section 12 does not empower the General Assembly to act alone, but rather distributes the power to suspend laws between the legislative and executive branches.[26]

The placement of Article I, Section 12 in our Constitution's Declaration of Rights further indicates that the provision is a negative check on executive power rather than an affirmative grant for the legislature to act without the Governor. Since 1790, the Framers

---

[25] Unlike in our system of government, in the United Kingdom presentment has evolved into a mere formality. However, even today, when Parliament passes a statute that suspends law, it appears that royal assent is still required. For example, Parliament's bill responding to the COVID-19 pandemic provided that "[a] relevant national authority may by regulations suspend the operation of any provision of this Act." Coronavirus Act of 2020, c. 7, § 88(1) (U.K.). That bill received royal assent. *See Royal Assent*, HOUSE OF LORDS HANSARD (Mar. 25, 2020), https://hansard.parliament.uk/lords/2020-03-25/debates/025CBE1A-37B3-4362-9FAC-94359D78E325/RoyalAssent.

[26] Notably, past cases involving Article I, Section 12 have focused upon whether the executive branch violated the provision. *See, e.g.*, *Commonwealth v. Williams*, 129 A.3d 1199 (Pa. 2015); *SEIU Healthcare Pa. v. Commonwealth*, 104 A.3d 495 (Pa. 2014); *Hetherington v. McHale*, 311 A.2d 162 (Pa. Cmwlth. 1973), *rev'd on other grounds*, 329 A.2d 250 (Pa. 1974).

of each of our Commonwealth's Constitutions have placed the clause involving the power to suspend laws in the section of the Constitution devoted to the protection of individual liberty. *See* PA. CONST. of 1790, art. IX, § 12, PA. CONST. of 1838, art. IX, § 12, PA. CONST. of 1874, art. I, § 12, PA. CONST. art. I, § 12. "[T]hose rights enumerated in the Declaration of Rights are deemed to be inviolate and may not be transgressed by government." *Gondelman v. Commonwealth*, 554 A.2d 896, 904 (Pa. 1989). The Declaration of Rights exists to protect Commonwealth citizens from government tyranny, not to delineate the powers of any branch of government. *See* Senators' Reply Brief at 24 (opining that the placement of the clause in the Declaration of Rights is to "prevent tyranny of the Governor in capriciously ordering citizens to do something through the suspension of law"). To this end, the Declaration of Rights itself warns: "To guard against transgressions of the high powers which we have delegated, we declare that everything in this article is excepted out of the general powers of government and shall forever remain inviolate." PA. CONST. art. I, § 25. The Declaration of Rights, including Article I, Section 12, serves to protect individuals from an overbearing government in general, not to empower any department of that government. Article I, Section 12 therefore cannot, on its face, be read as a means by which to bypass presentment in acts suspending prior legislation, where presentment was required for their enactment.

A comparison of Article I, Section 12 with other provisions of our Constitution that are exempt from presentment further supports this reading of the suspension power. As noted above, Article III, Section 9 explicitly exempts resolutions pertaining to adjournment from presentment. And Article XI of our Constitution sets forth a comprehensive scheme for amending the Constitution. *See Kremer*, 606 A.2d at 436 (describing Article XI as a "complete and detailed process for the amendment of that document"); *Griest*, 46 A. at 506 ("It is a system entirely complete in itself, requiring no extraneous aid, either in

matters of detail or general scope, to its effectual execution.").  Conversely, Article I, Section 12 neither offers explicit language exempting the suspension power from presentment nor describes a process in which the Governor has no role.  It is unlikely that the Framers would have granted such a far-reaching power in such an obfuscated fashion.  And authorizing the General Assembly to suspend laws unilaterally (*i.e.*, without presentment) is a far-reaching power indeed.  To allow the legislature to suspend laws without presentment would be to excise both presentment clauses from our Constitution.  Article I, Section 12 does not limit the temporal duration for which a law can be suspended, nor does it specify which types of laws may be suspended.  To grant the General Assembly such broad authority would be to rewrite our Constitution and remove the Governor from the lawmaking process.  Such a view is inimical to our system of checks and balances, a system in which presentment plays a critical role.

Relatedly, this Court has characterized the power of suspending laws as part of the process of lawmaking.  For example, when a party claimed that an action taken by the executive branch violated Article I, Section 12 and Article II, Section 1, which vests legislative power in the General Assembly, we read the two clauses together, writing that those provisions "vest[] legislative power in the General Assembly and give[] it the power to amend, repeal, suspend or enact statutes."  *SEIU Healthcare Pa. v. Commonwealth*, 104 A.3d 495, 500 n.3 (2014); *see also McCreary v. Topper*, 10 Pa. 419, 422 (1849) ("That would be arrogating legislative power, and suspending law.").  The suspension of statutes, like the amendment, repeal, or enactment of statutes, is a legislative action.  And legislative actions are subject to presentment.  *See* PA. CONST. art. III, § 9; *id.* art. IV, § 15.

Finally, we would be remiss to "disregard the gloss which life has written upon" suspension clauses in other constitutions.  *Youngstown Sheet & Tube Co. v. Sawyer*, 343

U.S. 579, 610 (1952) (Frankfurter, J., concurring). In Kentucky, for example, which traces its suspension clause to our Constitution, *see Baker*, 204 S.W.3d at 592, when the legislature has suspended laws, it has done so through statutes presented to the Governor for his or her approval. *See, e.g., Commonwealth ex. rel. Beshear v. Bevin*, 575 S.W.3d 673, 679-80 (Ky. 2019) (adjudicating a suspension clause case involving KY. REV. STAT. § 12.028, which was enacted through bicameralism and presentment); *Lovelace v. Commonwealth*, 147 S.W.2d 1029, 1034 (Ky. 1941) ("By this act of 1936 (Section 979b-5 *et seq.*, Statutes), the General Assembly has exercised that constitutional power and has authorized the courts to suspend the implications of the law which require entry and pronouncement of judgment without unreasonable delay. This law becomes a part of the statutory procedure and processes.").

The Senators call our attention to the suspension clause in the Louisiana Constitution. *See* Senators' Brief at 39. Yet the corresponding clause in that Constitution is fundamentally different from our own. Louisiana's Constitution, which houses the suspension clause in the article related to the legislative branch, provides:

> Only the legislature may suspend a law, and then only by the same vote and, except for gubernatorial veto and time limitations for introduction, according to the same procedures and formalities required for enactment of that law. After the effective date of this constitution, every resolution suspending a law shall fix the period of suspension, which shall not extend beyond the sixtieth day after final adjournment of the next regular session.

LA. CONST. art. III, § 20. Thus, the Louisiana Constitution explicitly exempts the suspension of laws from the Governor's veto; presentment is not required. *See also* David Alexander Peterson, *Louisiana's Legislative Suspension Power: Valid Method for Override of Environmental Laws and Agency Regulations?*, 53 LA. L. REV. 247, 255-56 (1992) (detailing the original history of the clause at the 1973 Louisiana Constitutional

Convention and noting that the delegates specifically voted against subjecting suspension to gubernatorial veto).[27]

Based upon the original history of Article I, Section 12, the Framers' decision to place that provision in our Declaration of Rights, a comparison between Article I, Section 12 and other provisions from which presentment is excluded, and the practice of other jurisdictions, we hold that Article I, Section 12 of the Pennsylvania Constitution does not affirmatively grant the General Assembly the power to suspend laws unilaterally. Rather, as an exercise in lawmaking, the suspension of laws must adhere to the requirement of presentment, an essential component of our Constitution's system of checks and balances.[28] Even if H.R. 836 amounted to a suspension of law by the General Assembly, that does not save it from the constitutional presentment requirement.

---

[27] Federal practice adds support to our reading of Article I, Section 12. Although the federal Constitution contains no clause concerning the suspension of laws, it does state that "[t]he Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it." U.S. CONST. art. I, § 9, cl. 2. The federal clause does not mention Congress, but the Framers' decision to place the clause in Article I, dealing with legislative power, means that only Congress can suspend the writ of *habeas corpus. See Hamdi v. Rumsfeld*, 542 U.S. 507, 562 (2004) (Scalia, J., dissenting) ("Although this provision does not state that suspension must be effected by, or authorized by, a legislative act, it has been so understood, consistent with English practice and the Clause's placement in Article I."); *Ex parte Merryman*, 17 F. Cas. 144, 148 (Taney, Circuit Justice, C.C.D. Md. 1861) ("[F]or I had supposed it to be one of those points of constitutional law upon which there was no difference of opinion, and that it was admitted on all hands, that the privilege of the writ could not be suspended, except by act of congress."). Each time Congress has suspended the writ of *habeas corpus*, it has done so through a statute, with presentment to the President. *See Hamdi*, 542 U.S. at 562-63 (Scalia, J., dissenting) (listing statutes by which Congress has authorized suspension of the writ); *see also Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. __, 2020 WL 34548109, at *19 (2020) (Thomas, J., concurring) (noting that, to the Framers, the clause suspending *habeas corpus* "likely meant a *statute* granting the executive the power to detain without bail or trial based on mere suspicion of a crime of dangerousness") (emphasis added). Thus, Congress has understood its power to suspend the writ of *habeas corpus* to require presentment.

[28] The Senators additionally contend that the legislature can suspend laws either through a bill or concurrent resolution. *See* Senators' Brief at 39. We do not decide

**B. The General Assembly Cannot Use Unconstitutional Means to Overturn a Governor's Decision to Suspend Laws After Delegating That Power to the Governor**

Finally, the Senators allege a violation of the non-delegation doctrine. In their initial brief, the Senators aver that, because the Governor's Proclamation itself was a suspension of law, "the General Assembly not only retained for itself—as it must—the ultimate authority for determining when a suspension of laws is no longer appropriate, but also specified the vehicle through which it may be exercised: a simple majority concurrent resolution." Senators' Brief at 42. For purposes of discussion, we assume, without deciding, that the Proclamation amounted to a suspension of law under Article I, Section 12.

In their self-styled "Reply Brief," the Senators argue, for the first time, that the Emergency Management Services Code itself is unconstitutional under the non-delegation doctrine. *See* Senators' Reply Brief at 2-7. "A claim is waived if it is raised for the first time in a reply brief." *Commonwealth v. Collins*, 957 A.2d 237, 259 (Pa. 2008). However, assuming *arguendo* that we can address the broader non-delegation claim, it is unavailing.

The Senators' initial argument is puzzling. They aver that the non-delegation doctrine only kicks in if the Governor is correct in believing that the Proclamation was "law." Senators' Brief at 3. The Senators confuse an order having the effect of law with one exercising legislative power. The non-delegation doctrine forbids entities other than the legislative branch from exercising the "legislative power," as those entities do not have "the power to make law." *Protz*, 161 A.3d at 833.

The Governor does not argue that the Proclamation is a law in and of itself, but rather that the Proclamation has "the force of law." Governor's Application at 28; *see also*

---

whether it is a bill or a concurrent resolution that is required to suspend a law. Whichever constitutional method the General Assembly employs, presentment is required.

35 Pa.C.S. § 7301(b) ("[T]he Governor may issue, amend and rescind executive orders, proclamations, and regulations which shall have the force and effect of law."). This may seem like a semantic difference, but it is not. Executive orders that affect individuals outside the executive branch "implement existing constitutional or statutory law." *Markham v. Wolf*, 190 A.3d 1175, 1183 (Pa. 2018) (citing *Shapp v. Butera*, 348 A.2d 910, 913 (Pa. Cmwlth. 1975)). But an executive order or an administrative regulation promulgated by an executive agency that implements a statute still has the *force of law*. Otherwise, no entity outside the executive branch could be compelled to abide by a regulation issued by an executive branch agency. Such a result would be inconsistent with long-standing precedent. *See, e.g.*, *Bell Tel. Co. of Pa. v. Lewis*, 177 A. 36 (Pa. 1935) (overruling a non-delegation challenge to a statute that permitted the Governor to determine when telephone and telegraph lines could be constructed along highways).

The Senators also cite our decision in *Protz* for the two limitations underlying the non-delegation doctrine: "First, . . . the General Assembly must make the basic policy choices, and second, the legislation must include adequate standards which will guide and restrain the exercise of the delegated administrative functions." *Protz*, 161 A.3d at 834 (internal quotation marks and citation mitted). The Emergency Services Management Code adheres to both standards.

The General Assembly, in enacting the statute, "ma[de] the basic policy choices." *Id.* The General Assembly decided that the Governor should be able to exercise certain powers when he or she makes a "finding that a disaster has occurred or that the occurrence of the threat of a disaster is imminent." 35 Pa.C.S. § 7301(c). In *Friends of Danny DeVito*, we reviewed whether the COVID-19 pandemic met that statutory definition, chosen by the legislature. *See Friends of Danny DeVito*, 227 A.3d at 885-92. That this Court relied upon the statute itself to make this ruling shows that the General

Assembly, not the Governor, made the basic policy choices about which circumstances are necessary to trigger the Governor's powers under the statute.

Additionally, the General Assembly has provided "adequate standards which will guide and restrain" the Governor's powers. *Protz*, 161 A.3d at 834. The General Assembly gave the Governor specific guidance about what he can, and cannot, do in responding to a disaster emergency. *See* 35 Pa.C.S. §§ 7301(d)-(f), 7302, 7303, 7308. The powers delegated to the Governor are admittedly far-reaching, but nonetheless are specific. For example, the Governor can "[s]upend the provisions of any regulatory statute . . . *if strict compliance with the provisions . . . would in any way prevent, hinder or delay necessary action in coping with the emergency.*" *Id.* § 7301(f)(1) (emphasis added). Broad discretion and standardless discretion are not the same thing. Only those regulations that hinder action in response to the emergency may be suspended. It may be the case that the more expansive the emergency, the more encompassing the suspension of regulations. But this shows that it is the scope of the emergency, not the Governor's arbitrary discretion, that determines the extent of the Governor's powers under the statute. The General Assembly itself chose the words in Section 7301(f)(1). The General Assembly, under its lawmaking powers, could have provided the Governor with less expansive powers under the Emergency Services Management Code. It did not do so.

Returning to the Senators' argument regarding the Governor's alleged suspension of law and the non-delegation doctrine, first, it is clear from the text of Article I, Section 12 and precedent that the General Assembly can delegate its suspension power to the executive branch. Article I, Section 12 states that the power of suspending laws can be exercised "by the Legislature or *by its authority.*" PA. CONST. art. I, § 12 (emphasis added). During the Constitutional Convention of 1790, one delegate moved "to strike the words

'or its authority,'" a motion which the Convention rejected, indicating that a majority of the Framers intended the power to be delegable.[29] THE PROCEEDINGS RELATIVE TO THE MINUTES OF THE CONVENTION THAT FORMED THE PRESENT CONSTITUTION OF PENNSYLVANIA 261 (1825). This Court has confirmed that the power to suspend laws can be delegated. *See Young v. Fetterolf*, 182 A. 676, 680 (Pa. 1936) ("The vesting in certain officials or persons by the legislative branch of government, of the power to suspend the operation of laws, has more than once received unequivocal judicial sanction.").[30] Even assuming that the Governor's delegated power under Section 7301(c) amounted to a power to suspend laws, this Court already has concluded that the Governor's actions do not violate the separation of powers doctrine, *Friends of Danny DeVito*, 227 A.3d at 892-93, and, as noted above, Section 7301(c) complies with the requirements of the non-delegation doctrine.

In their distinct non-delegation argument with regard to the suspension of laws, the Senators contend that, when the Governor suspends laws pursuant to a delegation of authority, he "acts as the legislature's agent and, thus, is subject to any restrictions the General Assembly may see fit to put into place." Senators' Brief at 41. The same, however, could be said of the Governor's power to issue regulations, via an executive branch agency, when that power is delegated from the legislative branch. In such an instance, the Governor is acting as agent of the legislature, subject to the constraints in

---

[29] The language in our 1790 Constitution did not include a second instance of the word "by." *See* PA. CONST. of 1790, art. IX, § 12 ("That no power of suspending laws shall be exercised, unless by the legislature, or its authority.").

[30] *Cf. Thuraissigiam*, 2020 WL 34548109, at \*19, \*21-22 (Thomas, J., concurring) (relating that the Framers of the federal Constitution contemplated, and early state statutes allowed, a delegation of power to the executive to suspend the writ of *habeas corpus*); *Young*, 182 A. at 679 n.2 (noting that "[t]he actual suspension of [the] writ [of *habeas corpus*], however, has always been done by presidential proclamation" pursuant to a delegation from Congress).

the authorizing statute. The Senators' argument implies that this Court should create a heightened standard for non-delegation when the delegated power is to suspend law, as opposed to issuing regulations with the force of law. *See id.*; *but see* Senators' Reply Brief at 25. As stated above, the power to suspend laws is part of the general legislative power, *see SEIU Healthcare*, 104 A.3d at 495; *McCreary*, 10 Pa. at 422, and we see no reason to treat suspending laws differently from enacting, amending, or repealing laws for the purpose of the non-delegation doctrine. Moreover, this Court already has declared that the "implication [of Article I, Section 12] does not alter the restrictions on delegating legislative decision making as embodied in Article II, Section 1." *W. Phila. Achievement Charter Elementary Sch. v. Sch. Dist. of Phila.*, 132 A.3d 957, 968 (Pa. 2016); *see also* Senators' Reply Brief at 25 (noting that the delegation of the suspension power is "subject to the restrictions reflected in existing non-delegation principles drawn from Article II, Section 1," and citing *West Philadelphia*). Thus, the same restrictions on delegating power apply in all legislative contexts, including when delegating the power to suspend laws.

The Senators may be frustrated that, the General Assembly previously having delegated power to the Governor, the rescission of that power requires presentment, perhaps necessitating a two-thirds majority to override a veto. But the potential for such frustration inheres whenever the legislative branch delegates power to the executive branch in any context. The General Assembly itself decided to delegate power to the Governor under Section 7301(c). Current members of the General Assembly may regret that decision, but they cannot use an unconstitutional means to give that regret legal effect. The General Assembly must adhere to the constitutional requirement of presentment even when attempting to overturn the Governor's delegated putative authority to suspend laws.

Over one hundred years ago, when confronting a similar issue of a concurrent resolution and the need for presentment, we stated:

The protection against unwise and oppressive legislation, within constitutional bounds, is by an appeal to the justice and patriotism of the representatives of the people. If this fail[s], the people in their sovereign capacity can correct the evil, but courts cannot assume their rights. The judiciary can only arrest the execution of a statute when it conflicts with the Constitution. It cannot run a race of opinions upon points of right, reason, and expediency with the lawmaking power. . . . If the courts are not at liberty to declare statutes void because of their apparent injustice or impolicy, neither can they do so because they appear to the minds of the judges to violate fundamental principles of republican government, unless it should be found that these principles are placed beyond legislative encroachment by the Constitution.

*Russ*, 60 A. at 173 (quoting COOLEY ON CONSTITUTIONAL LIMITATIONS, c. 7, §§ 4, 5 (6th ed. 1890)). Members of the General Assembly and residents of our Commonwealth have differing opinions on how to respond to the COVID-19 pandemic. Some may believe that the Governor's exercise of power under Section 7301(c) is necessary and proper. Others may feel that Section 7301(c), and the Governor's subsequent Proclamation, is "unwise and oppressive legislation." *Russ*, 60 A. at 173. As members of the judicial branch, we do not, and indeed cannot, take positions on such matters of policy, because, aside from the domain of common law, "setting public policy is properly done in the General Assembly and not in this Court." Senators' Reply Brief at 30. We "are not at liberty to declare statutes void of their apparent injustice or impolicy." *Russ*, 60 A. at 173. Our function is far more restrained. In this instance, we determine only whether the actions of our sister branches of government have complied with our Commonwealth's Constitution and statutory law.

The General Assembly's attempt, through H.R. 836, to overturn the Governor's Proclamation of Disaster Emergency without presentment, violated Section 7301(c) of the Emergency Services Management Code. As an act with legislative effect, H.R. 836, like

any concurrent resolution offered under Section 7301(c), required presentment, a key component of our Constitution's balance of powers among the several branches of government, a balance that prevents one branch from dominating the others. H.R. 836 did not meet the criteria allowing for any exception to presentment, and our interpretive canons compel us to read Section 7301(c) as requiring presentment. Additionally, Article I, Section 12 of the Pennsylvania Constitution does not empower the legislature to act unilaterally to suspend a law, and the Governor's purported suspension of law did not violate the non-delegation doctrine. Thus, because the General Assembly intended that H.R. 836 terminate the Governor's declaration of disaster emergency without the necessity of presenting that resolution to the Governor for his approval or veto, we hold, pursuant to our power under the Declaratory Judgments Act, 42 Pa.C.S. § 7532, that H.R. 836 is a legal nullity.[31]

Justices Baer, Todd and Donohue join the opinion.

Justice Dougherty files a concurring and dissenting opinion.

Chief Justice Saylor files a dissenting opinion in which Justice Mundy joins.

---

[31] Having resolved this case, we lift our order staying the proceedings of the Commonwealth Court in *Scarnati v. Wolf*, 344 MD 2020. *See* Order, 104 MM 2020, 6/17/2020.